UNITED STATES, Appellee,

v.

Joseph C. KOZAK, Private, U.S. Army, Appellant.

No. 39,797.

SPCM 14393.

U. S. Court of Military Appeals.

March 8, 1982.

For Appellant: *Captain James A. McA-tamney* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Elliot J. Clark, Jr.* (on brief); *Major Joyce E. Plaut.*

For Appellee: *Colonel R. R. Boller* (argued); *Major Douglas P. Franklin, Major Ted B. Borek, Captain Karen S. Gillett* (on brief); *Captain James C. Underhill, Jr., Captain Kenneth H. Clevenger.*

*Opinion of the Court*

COOK, Judge:

Despite his pleas, the accused was convicted by special court-martial, military judge alone, of wrongful possession of marihuana in the hashish form, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge, confinement at hard labor for 2 months, forfeiture of $279 per month for 2 months, and reduction to the grade of Private E–1. The convening authority approved the adjudged sentence. A divided panel of the United States Army Court of Military Review affirmed the findings and sentence. 9 M.J. 929 (1980). We granted review (10 M.J. 198) to consider the accused's challenge of the ruling of the military judge admitting one plate of hashish found in a train station baggage locker on the ground that it was obtained as a result of an illegal search and seizure, in violation of the Fourth Amendment of the United States Constitution. We disagree and affirm.

During the afternoon of April 3, 1979, Lt.Col. Beale, Commander of the 1st Battalion, was informed by one of his company commanders that he had received information from an informer, who had been proved reliable on previous occasions, that he overheard a conversation between the accused and a Private Murphy. The informer said that he learned from the conversation that there was a quantity of drugs stored in a locker in the bahnhof (train station) and that the drugs were to be picked up at midnight by either the accused or Murphy. Lt.Col. Beale contacted the Criminal Investigation Command

(CID) and asked them to handle the case. He gave them the background information from the informer and told the CID agent "that I would like for ... [him] to ... go to the bahnhof, observe the locker and to attempt to apprehend, Private Kozak and pick up the drugs that—if possible, that he was supposed to have received there from that locker." The CID was later provided descriptions of both the accused and Murphy and the fact that it was more likely that the accused would come to the bahnhof since Murphy was on duty that night.

The CID team assembled at the bahnhof, and pursuant to instructions from their superior, began searching the lockers with the assistance of the German train police and criminal police. Eleven plates of hashish were found in the third or fourth locker opened. All of the hashish was removed by a German police officer, but subsequently, he put one plate back into the locker and resecured the door.[1] At a few minutes after midnight, an individual fitting the description of the accused approached the lockers, inserted a key, and opened the locker containing the hashish. He looked inside and then slammed his fist down on the inside of the locker, exclaimed a commonly-heard expletive, and slammed the door of the locker. He was immediately apprehended by the CID agents and the German police. A search of accused failed to produce the plate of hashish, and the German police officer then removed it from the locker.[2]

Upon motion by defense counsel, the military judge, without stating a reason, suppressed ten plates and convicted the accused of possession of one plate.

Several significant facts are ascertainable from the record. First, there was probable cause for the apprehension and search of the accused. The reliability of the informer had been established in at least three prior drug convictions, and he was known to have "strong religious beliefs and a dislike for drugs." Further, he stated the source of his information was from a conversation he overheard between the accused and his confederate. Thus, the *Aguilar-Spinelli*[3] tests are satisfied. *See United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In addition, the time, the place where the evidence was to be found, and the name and description of the accused and Murphy were accurately given. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Second, the authorization given by Lt.Col. Beale was quite specific and reasonable in scope in relation to the information provided to him. It was to observe the lockers, wait for the accused or Murphy to open the locker, and then apprehend the suspect and seize the drugs. It is significantly clear that Lt.Col. Beale only intended to authorize the seizure of drugs located within the locker opened by the accused, and did not intend to authorize a complete search of all the lockers.[4] Third, the first search of the lockers and seizure of the

---

1. The record of trial is not clear as to the legal position of the German police officers. The CID agents told Lt.Col. Beale "that they would have to contact the German Polizei since it was at a German location and that they would work within their rules and policies in that regard." It is apparent that the German police felt no hesitation under German law to search the train station lockers to find the illegal drugs. Whatever might have been their motivation, we conclude there was sufficient participation by American agents to make this an American search. *See Stowe v. Devoy*, 588 F.2d 336 (2d Cir. 1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d

806 (1977); *cf. United States v. Morrison*, 12 M.J. 272 (C.M.A. 1982).

2. One of the German policemen testified that the position of the plate of hashish was different from where he had previously placed it in the locker.

3. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

4. In response to a question by defense counsel, Lt.Col. Beale stated: "My authorization then was to search the individual and the *possessions* of the individual assigned to my command." (Emphasis supplied.)

drugs exceeded the authorization given by Lt.Col. Beale and, hence, was a violation of the Fourth Amendment. The question is whether that search so tainted the apprehension of the accused as to make the subsequent seizure of the hashish inadmissible.

Prior to *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), courts followed the common law rule that all competent evidence, whether obtained lawfully or unlawfully, was admissible. *See Adams v. New York*, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed.2d 575 (1904). In *Weeks v. United States, supra* at 232 U.S. 398, 34 S.Ct. at 346, the Supreme Court held that evidence seized from the defendant's home without the warrant required by the Fourth Amendment could not be used against him at trial over his objection. This was the inception of the now familiar exclusionary rule. Following this, in *Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Court extended the rule to include information gained from illegally seized evidence. Later, in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963),[5] the rule was applied not only to evidence which was the direct product of the unlawful search and seizure but also to evidence obtained from leads supplied by the direct evidence. This extension of the exclusionary rule was metaphorically called the "fruit of the poisonous tree" doctrine. *Nardone v. United States*, 308 U.S. 338, 341, 60

S.Ct. 266, 267, 84 L.Ed. 307 (1939). However, in developing this complex and often difficult-to-apply doctrine, the Court recognized that

[a]ny claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped.... [and that] two opposing concerns must be harmonized: on the one hand, the stern enforcement of the criminal law; on the other, protection of that realm of privacy left free by Constitution and laws but capable of infringement either through zeal or design.

*Id.* at 340, 60 S.Ct. at 267. Hence, facts illegally obtained do not necessarily "become sacred and inaccessible," and certain exceptions which would free such evidence from the taint of the poisoned tree have been recognized. *Silverthorne Lumber Co., Inc. v. United States, supra* 251 U.S. at 392, 40 S.Ct. at 183.

The first of these exceptions allows illegally obtained items to become admissible "[i]f knowledge of them is gained from an independent source." *Ibid.* The second is where the connection between the illegal act and the evidence offered has "become so attenuated as to dissipate the taint." *Nardone v. United States, supra*, 308 U.S. at 341, 60 S.Ct. at 267. The third exception, accepted by a large number of federal and state courts, but not yet specifically approved by the Supreme Court,[6] is the so-

---

**5.** In *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), quoting Maguire, *Evidence of Guilt*, 221 (1959), it was stated:

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

**6.** The Supreme Court in *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), reversed the holding in *Crews v. United States*, 389 A.2d 277 (D.C.Ct.App.1978), which rejected the inevitable-discovery excep-

tion. The several opinions, by implication, approve the inevitable-discovery concept but do not specifically adopt it. In addition, in *Brewer v. Williams*, 430 U.S. 387, 407 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977), the Supreme Court noted:

While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams.

This hint was followed by the Iowa courts in the retrial of Williams for murder. *State v. Williams*, 285 N.W.2d 248 (1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980).

called inevitable discovery rule.[7] *See State v. Williams*, 285 N.W.2d 248 (Iowa 1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980), and cases cited therein; *United States v. Massey*, 437 F.Supp. 843 (MD Fla.1977), and cases cited therein. This exception has been adopted by the vast majority of all of the courts which have considered it. *State v. Williams, supra* ; 3 LaFave, *Search and Seizure* § 11.4 (1978); Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 Col.L.Rev. 88 (1974); Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule*, 55 J.Crim.L., C., & P.S. 307 (1964). The rule is defined in *People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 796, 300 N.E.2d 139, 141 (1973), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973):

> [E]vidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence.

We have previously declined to adopt the inevitable-discovery exception to the exclusionary rule into military law. Judge Duncan, speaking for the majority in *United States v. Peurifoy*, 22 U.S.C.M.A. 549, 552, 48 C.M.R. 34, 37 (1973), said:

In our view, *Wong Sun* and the Manual [for Courts-Martial, United States, 1969 (Revised edition), para. 152][8] stand for the proposition that where evidence has been obtained by exploitation of an unlawful search, the Government must affirmatively establish that the evidence was *in fact* discovered by a means independent of the illegality. It is not enough that it *could have been* so discovered.

In concurring and dissenting, Judge Quinn wrote that "this situation clearly falls within the scope of the evolving doctrine of 'inevitable discovery.'" *Id.* at 553, 48 C.M.R. at 38. The time has come for us to reexamine the applicability of the inevitable-discovery rule to military law.[9]

In spite of the rejection of the inevitable-discovery exception in *Peurifoy*, this Court, in an earlier case factually paralleling this case, applied the inevitable-discovery concept. In *United States v. Ball*, 8 U.S.C.M.A. 25, 23 C.M.R. 249 (1957), CID agents who were investigating a burglary from the post exchange saw a suitcase fitting "the description of one" taken from the post exchange in "a public locker in a local train station." Agents were sent to the train station "with instructions to arrest any person" who called for or claimed the suitcase. "Two over-zealous agents . . . obtained . . . entry to the locker" and searched the suitcase. Inside were found other items matching the description of items stolen from the

---

**7.** Analysis indicates that the inevitable-discovery theory is closely related to both the attenuation and independent source exceptions except to the extent that it permits the prosecution to prove that the evidence *would* have been discovered through legitimate means in the absence of official misconduct. This necessarily may induce an area of speculation as to what *might* have happened instead of what *did* happen if the rule is loosely applied. *See Wayne v. United States*, 318 F.2d 205 (D.C. Cir. 1963), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963). *See* Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 Col.L.Rev. 88 (1974).

**8.** Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition), provides in pertinent part:

> Evidence is considered as having been obtained as a result of the illegal acts only if it has been acquired by an exploitation of those acts instead of by means sufficiently distinguishable to be purged of the taint of the illegality.

The present rule is Mil.R.Evid. 311.

**9.** The use of the verb *"could"* makes the opinion in *United States v. Peurifoy*, 22 U.S.C.M.A. 549, 552, 48 C.M.R. 34, 37 (1973), suspect as to its rejection of the exception. Clearly the prosecution must prove that the proffered evidence *would* have been acquired through legal means even if the illegal act had never taken place. Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule*, 55 J.Crim.L.,C., & P.S. 307, 315 (1964). However, the rule is clearly identified in the dissenting opinion in *Peurifoy*.

exchange. They replaced the items in the suitcase and returned it to the locker. When the accused called for the suitcase, they arrested him and seized the suitcase. At trial the accused objected to the introduction of the suitcase on the ground that it was the product of an illegal search and seizure. There was no question that the search of the locker was carried out without any authority from the commander empowered to grant a search authorization. We held that the seizure of the suitcase was not the product of the illegal search of the locker by the agents but was instead the result of a search pursuant to a lawful arrest. Speaking for the majority, Judge Ferguson said:

> Under these circumstances we feel that the arrest of the accused was reasonable and hence the search and seizure accompanying the arrest was valid. The prior illegal search did not supply the information which led to the accused's apprehension.

*Id.* at 30, 23 C.M.R. at 254. In discussing the holding in *Ball,* one commentator wrote:

> The facts, however, indicate quite plainly that the illegal search did "lead to" the arrest in the sense that it made certain what had been merely "suspected," however reasonably, before. It transformed "probable cause" for an arrest into positive knowledge that the locker contained the stolen goods. To that extent, at the very least, the arrest was in fact based upon the illegally obtained knowledge, and it cannot be said that the search did not contribute to the arrest. The vital factor is the clear showing of record that

the arrest would have been made even if the illegal search had not taken place. Maguire, *supra* at 311.

Thus, it would appear that the *Ball* holding supports the concept of the inevitable discovery exception in the sense that it is grounded on the proposition that the suitcase was seized, not because of the illegal search, but because of a legitimate police investigation leading to the apprehension of the accused on probable cause to believe that he was the person responsible for the burglary and the consequent search of his person and belongings pursuant to that apprehension.

In the instant case there can be no doubt that the accused would have been arrested when he arrived at the train station and opened the locker. It was truly inevitable that the hashish would be discovered at that time; only the failure of the accused, or Murphy, to appear at the time and place in question could have prevented the ultimate discovery of the hashish.[10] In fact that is what happened, and the accused was apprehended. The seizure of the hashish from the immediate area in which he was apprehended was legally permissible pursuant to that apprehension. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

We, therefore, hold that the prosecution proved that the seizure of the hashish was inevitable through the exercise of proper police procedures authorized by proper authority despite the prior illegal search of the accused's locker.[11] To the extent this

---

10. At the time of apprehension the accused was standing four to five feet from the locker. This is within the area made permissible to search by *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969):

> [I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule.

Furthermore, "it is not at all clear that the 'grabbing distance' authorization in the *Chimel*

case is conditioned upon the arrested person's continued capacity 'to grab.' " *People v. Floyd,* 26 N.Y.2d 558, 312 N.Y.S.2d 193, 260 N.E.2d 815, 817 (N.Y.1970). *See* Mil.R.Evid. 314(g)(2).

11. The seizure of the hashish is permissible under either of the other two exceptions to the exclusionary rule. Obviously, the unlawful entry into the locker had no effect on the preexisting probable cause to arrest the accused; it merely confirmed what had only reasonably been suspected up to that point. The apprehension of the accused was authorized by probable cause supplied by the informer. The ef-

holding conflicts with the decision in *United States v. Peurifoy, supra,* that decision is overruled.[12] In applying this exception to the exclusionary rule in the future, we will require that after an accused challenges the legality of a search, the prosecution must, by a preponderance of the evidence, establish to the satisfaction of the military judge that when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery

of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred. *See* Maguire, *supra; United States v. Brookins,* 614 F.2d 1037 (5th Cir. 1980); *State v. Williams, supra; Somer v. United States,* 138 F.2d 790 (2d Cir. 1943).

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

---

fect of the illegal search was sufficiently attenuated to invoke the *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), exception. In addition, the information providing probable cause for the apprehension of the accused came from a source completely independent of the illegal search, satisfying the *Silverthorne Lumber Co., Inc. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), exception. Hence, under any theory, applica-

tion of the exclusionary rule was not mandated, and the ruling of the military judge admitting the hashish was correct.

12. *See United States ex rel. Roberts v. Ternullo,* 407 F.Supp. 1172, 1178 (E.D.N.Y.1976):

If ever there was a case in which the New York rule of "inevitable discovery" ought not to be viewed as an unconstitutional exception to the exclusionary rule, this is it.