Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

**UNITED STATES**

**v.**

**Sergeant Elliott M. SPENCE, FR 238–15–2326, United States Air Force.**

**ACM 27609.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 24 Jan. 1989.

Decided 28 Sept. 1989.

### DECISION

KASTL, Senior Judge:

This is a court-martial case involving an accused who referred himself for child abuse. In view of the unique circumstances, we find that the appellant gained from Government officials over an eight month period a reasonable expectation that successfully completing a program of therapy would rule out a court-martial for his conduct.[1] Accordingly, we reverse his convic-

---

1. The military judge, in special findings, ex-    pressed some discomfiture with the fact that no

tion for committing indecent acts with a child under Article 134, UCMJ, 10 U.S.C. § 934.

## I

### Self-Referral by the Appellant

The stipulation of fact entered into by the parties is an excellent and detailed summary of the salient facts. Because this case is fact-specific, we will quote that stipulation virtually verbatim.

On 6 January 1988, the accused, Sergeant (Sgt.) Elliott M. Spence, went to the Mental Health Clinic at Clark Air Base, Republic of Philippines, for assistance. He completed a Social History Record and listed his reason for coming as: "I have a problem with abusing my six year old adopted stepdaughter. I know I should not but I cannot stop myself."

Sgt. Spence was then seen by Captain Hagan, a social worker assigned to the Clark Air Base Mental Health Clinic. Hagan reviewed the Social History Record before talking to the appellant; he purposely did not ask Sgt. Spence any specifics of the abuse. He determined there was no danger to the child. He explained to the appellant this was a family advocacy matter and he would be referring Sgt. Spence to that section for assistance. Hagan then referred the appellant to Ms. Bonnie Campbell of the Clark Family Advocacy Clinic. Sgt. Spence agreed to return to see her.

Ms. Campbell was employed by the Clinic as a civilian social worker. She has a Master's Degree in Social Work, with a total of eight years experience. She has had extensive personal involvement working with families experiencing physical and sexual abuse. She assisted in investigating and providing counseling and treatment in about 30 to 40 cases at Clark Air Base, as well as another 100 to 120 cases in Florida and California. Most of her practice focuses on treatment of family members and children rather than abusers.

### The Appellant at the Family Advocacy Clinic

On 8 January 1988, Sgt. Spence met with Ms. Campbell at the Family Advocacy Clinic. Ms. Campbell knew only that Spence was seeking counseling for abusing his six year old stepdaughter. She had read the Social History Record and spoke to Captain Hagan, and she initially assumed the matter involved minor physical abuse rather than sexual abuse. The counseling session started with Spence telling Ms. Campbell about his problem; he only indicated "feelings about touching" his stepdaughter. He stated that he wanted help.

Ms. Campbell stopped Spence and explained her role as a Family Advocacy Officer. She told him that her role was to assess whether abuse was taking place and if so, determine what could be done to help him and his family. She told him that she was required by regulations to report severe physical or sexual abuse to the Office of Special Investigations (OSI); that the appellant might have to face legal action; and that he might get "kicked out" of the Air Force and even go to jail. She told him that she had heard of this happening before. She did not, however, read Article 31, UCMJ, 10 U.S.C. § 831, to him or tell him it might be wise to seek legal assistance. Ms. Campbell did not feel that it was part of her job to give such advice.

Ms. Campbell also explained the process of assessing cases to Spence. She explained that she did the initial investigation of the case and then reported to the Child Advocacy Committee, of which she was a member. She told him that officials of several other agencies also sat on the Child Advocacy Committee and that their responsibility was to determine what course of action a particular case should have. *She advised him that if the Child Advocacy*

---

one had taken a definite stand for eight months as to whether the appellant should be disciplined. He noted that among the "victims" of this case were: "... the Commander convening this court, whose Medical Center Commander, the full staff appointed to the Child Advocacy

Committee and the Special Court-martial Convening Authority, all apparently concurred and or signed off on pursuing this case by 'treatment' rather than trial after clearly being on notice as to the facts."

*Committee determined that a family and the military member should receive treatment, the military member would not be prosecuted.* She also told Sgt. Spence that it was up to the Committee rather than her.

Spence became upset and expressed concern he would get in trouble for seeking help. Ms. Campbell told him she would try to help but she could not promise anything. She told him that she would act as his "advocate" with the Child Advocacy Committee, and that she would urge the Committee that treatment was the most appropriate option.

Ms. Campbell decided to stress the treatment option for several reasons. First, based on her experience with sexual abuse cases, she felt that this was an isolated incident, that Sgt. Spence was not someone who was sexually attracted to children. Second, she felt that Sgt. Spence was sincere about wanting help. Third, she felt that the steps the family had taken to protect the daughter were sufficient. Fourth, it was her opinion that the family wanted to stay together. Finally, she felt that prosecution usually leads to jail and that separating the family due to confinement would only further "victimize the victims". Sgt. Spence explained that his stepdaughter had told his wife about the abuse; this caused his wife to get very angry and she had threatened to leave him and go to the Philippine authorities. He told Ms. Campbell that he had tried to stop himself, but that he realized that he needed help.

Sgt. Spence also told Ms. Campbell that he had offered to move out of the house, but since his wife had not asked him to he was still living there. Sgt. Spence agreed to bring his wife and stepdaughter into the Family Advocacy Office on Monday, 11 January.

### The Appellant's Family at the Clinic

On 11 January, Sgt. Spence, his wife, and the victim—his six year old stepdaughter, Cryl—went to the Family Advocacy Office. Ms. Campbell initially spoke with Cryl alone to assess whether Cryl had been abused. Cryl related that Sgt. Spence had on several occasions touched and rubbed her genitals—sometimes with his hands and fingers, and sometimes with his thumb over the top of her genitals. Sometimes the accused would take off her shorts and clothes and sometimes he would do it under her clothes. Cryl said that one time the accused gave her money but she did not want it and finally she told her mother.

Next, Ms. Campbell spoke with the accused's wife. Ms. Campbell then reinterviewed Cryl. She asked Cryl if her father had been doing anything else to her. Cryl hesitated and then said he put his "peek-a-boo" (she pointed to an anatomical male doll's penis and said she and her mother called it a "peek-a-boo") between her legs. This was also done on her bed in her bedroom when mother was gone. Father took her clothes off from her bottom and took his pants and underwear off. She demonstrated with the dolls that he laid behind her with his penis approaching her from behind. Cryl said the accused pushed his "peek-a-boo" between her legs tight and masturbated to climax. When Ms. Campbell asked her if this had happened once or more than once, Cryl replied "three times." Cryl expressed her anger at Sgt. Spence by hitting the father doll about seven or eight times in the face and mumbling "bad, bad." Cryl also told Ms. Campbell that all of this had stopped "a while ago."

After these interviews, Ms. Campbell set up a medical exam for Cryl. She also contacted the accused's First Sergeant and Special Agent Norris of the Clark Air Base Office of Special Investigations. Agent Norris told her to call back after the medical exam had been completed.

On 13 January, Ms. Campbell spoke with Dr. Rollins of the Clark OB/GYN Center, who reported Cryl's medical exam negative for penetration or venereal disease. Ms. Campbell then contacted Agent Norris with the results. In turn, Agent Norris told her the OSI would just take the information for their files and not actively investigate the case.

On the same day, Sgt. Spence met with Ms. Campbell for a therapy session. At the end of the session, Ms. Campbell told him she would be referring him to (Dr.)

Major Felix J. Subervi, a Clinical Psychologist at the Clark Air Base Mental Health Clinic, for further therapy. Mrs. Spence and Cryl would continue to see Ms. Campbell for counseling at the Family Advocacy Clinic.

On 19 January, Ms. Campbell saw both Cryl and Mrs. Spence for further therapy. Mrs. Spence told Ms. Campbell how Cryl had started locking the door to her bedroom. Cryl related to Ms. Campbell that she locked her door at night to make sure her father would not come in; she was still concerned he would try to touch her, but he had not made any inappropriate gestures. Mrs. Spence said she was not as angry at Sgt. Spence as she had been.

Subsequently, Ms. Campbell saw both Cryl and Mrs. Spence for several more sessions. During these sessions Cryl was alert, open, oriented, and cheerful. Mrs. Spence's anger continued to abate. On 16 February, Mrs. Spence related that their marital relationship was improving and that the appellant was trying to work together with her on their marriage. She also said that Cryl's behavior had returned to normal. Cryl told Ms. Campbell that there were no problems and that she wasn't worried about her father hurting her anymore; that she felt comfortable around him. In Ms. Campbell's opinion, Cryl had dealt with the matter in the short term in a very healthy manner. Based on her experience with children, Ms. Campbell believed that Cryl's prognosis was very good.

### The Child Advocacy Committee Determination

On 21 January 1988, the Child Advocacy Committee met. After discussing Sgt. Spence's case and receiving a detailed briefing from Ms. Campbell, the Committee decided that mandatory treatment for the family was the appropriate option. Representatives from the Legal Office, the OSI, and various other agencies sit on this Committee. Minutes of this meeting were prepared and reviewed and signed by Colonel John S. Donovan, who at the time was the Special Court-martial Convening Authority.

Ms. Campbell called Sgt. Spence and told him that the Committee had decided that treatment was appropriate. *She told him that if he continued with mandatory treatment, he would not be prosecuted.*

Sgt. Spence began treatment with Major Subervi. Ms. Campbell referred Sgt. Spence to Major Subervi because most of her experience was with treating children and other family members. During this time, Sgt. Spence lived with his family, and Cryl was not placed in a foster home.

In April 1988, Ms. Campbell talked with Sgt. Spence about missing group appointments. *She reemphasized that treatment was mandatory to avoid prosecution.* Sgt. Spence explained to her that during part of the time she was discussing, he was away on temporary duty and that he had made one of the appointments, but that Major Subervi had not been there, nor had he responded to a message left by Sgt. Spence. Spence told Ms. Campbell that he did not like the way that Major Subervi approached him, and asked if he could see someone else. Ms. Campbell suggested that Sgt. Spence talk that out with Major Subervi. Spence agreed to do so. After this discussion, Sgt. Spence continued in treatment with Major Subervi until 29 July 1988.

During his 14 July session, Sgt. Spence questioned Major Subervi about the possibility of upgrading his security clearance. Major Subervi was surprised that Sgt. Spence still had a security clearance at all. Subervi then called Sgt. Spence's commander, Lieutenant Colonel Bell, and discussed the case. Until that time, Bell had not been briefed on the details of Sgt. Spence's case.

Sgt. Spence went in to see Lieutenant Colonel Bell and after rights advisement gave a full oral and written statement to Colonel Bell and the first sergeant. This led to the preferral of court-martial charges on 24 October 1988.

### Three Other Significant Factors

In addition to the stipulated facts, three other matters are pertinent to our analysis:

1. The appellant's motives. The military judge found that the appellant had sought help at the Clark clinic because of two motivations—a desire for the help advertised as available on the official United States military television network, FEN, and by a threat of the appellant's wife to seek help or face her turning him in to Philippine officials.[2]

2. Alternatives available in the civilian community. Major Subervi testified that the only available method for treatment of this sort was through military channels; help that may have been available off-base was inadequate, he testified, "in terms of the U.S. standards."

3. The Social History Record. The appellant testified on various motions. He related that he was led to believe that his Social History Record, which he filled out when first appearing at the Clark Air Base clinic, would remain in that facility. The accompanying "Patient's Information Sheet" which the appellant signed as indicating he understood its contents, is attached to the Social History Record. Concerning confidentiality and privacy, the Information Sheet notes that:

... active duty members *referred by their squadrons* should be aware that a report will be returned to the squadron with our recommendations ... Your Article 31 rights against self-incrimination may apply and these will be explained to you by your therapist if you wish ... (emphasis added).

The Information Sheet also advises that:

The only detailed records of your treatment will be kept in the Mental Health Clinic under lock and key. Under certain circumstances, government agencies can obtain information from these records without your authorization. Any release of such records will be in full accordance with limitations imposed by the Privacy Act. Entries in your Outpatient Record will be kept to a minimum in an attempt to maintain privacy and will attempt to balance your reasonable expectations of privacy against a possible need for information during future care.

II

Based on the facts before us, we reverse the appellant's conviction. Following his voluntary self-referral, the Air Force, through its representatives and agents, began to treat the medical and social aspects of Sergeant Spence's child abuse. These staff members were designated by regulation[3] and selected by the commander; they operated regularly through the chain-of-command. They were agents of the Air

---

**2.** The FEN videotapes were played for the court at trial. The appellant stated that he had seen these specific advertisements, causing him to think about self-referral.

One such tape contains the following narration:

People keep abuse a secret for many reasons. They tell themselves it was just this once or it won't happen again, but it usually does, making them feel smaller and smaller until they feel there's almost nothing left. If you're keeping abuse a secret, it's time you stopped. Talk to your Family Advocacy Representative for help.

Another video release contains this narration by a man in civilian clothing, accompanied by a woman and child:

We used to have big problems. I was violent. I didn't want to be, but I didn't know how else to handle my frustrations. So, I took it out on my family. I never wanted to hurt them, but I did. Then one day I woke up and I couldn't stand the sight of my own face. I knew I needed help. So, I contacted the Family Advocacy Representative and I found the kind of answers that I didn't know existed. He helped us put our family back together with programs and assistance that stopped my violence. [After the woman says "Oh, thank you, sweetheart," the narration continues]: Well, now I'm a proud father, husband, human being. One thing I know for sure, I couldn't have done it without help.

Two other FEN video presentations make it clear that the program is aimed at both the abused and the abuser:

[discussing spousal abuse]: Whether you're the one who's abusing or being abused, you're a victim of shame and isolation ... Maybe seeking help is a new idea for you, but it's a good idea. Contact your Family Advocacy Representative.

[addressing general pressure on being away from home]: Yes, pressure builds and some people release pressure by abusing the ones they love, which won't relieve the pressure at all. If you've been abusive to someone, ask your Family Advocacy Representative for help. It will definitely help you deal with the pressure."

**3.** See AFR 160–38, *Air Force Family Advocacy Program,* Section B, (5 November 1981).

Force—no more and no less. *See generally United States v. Quillen*, 27 M.J. 312 (C.M.A.1988). The appellant relied on their uncontradicted representations for eight months, successfully participating in a program of rehabilitation. We conclude that, at least by the end of this eight month period, Sergeant Spence acquired a legitimate and reasonable expectation that he would not be subjected to punitive action.[4] See *United States v. Brown*, 13 M.J. 253, 258–259 (C.M.A.1982).

To define a bright-line rule of thumb for future cases from these tangled facts is futile. We must view each situation separately, weighing the competing considerations of individual versus Air Force rights and responsibilities. In this case, we are convinced that precedent—and fair play— require us to reverse this conviction. Any other conclusion requires us to perform too many logical leapfrogs to sustain a finding of guilty. *See generally Shepardson v. Roberts*, 14 M.J. 354, 358 (C.M.A.1988) (fairness and due process compel Government to abide by pretrial agreement which accused relied on to his detriment, even if convening authority retained the right to withdraw from it).

### Analysis of Significant Factors

It is basic to our responsibility that we affirm only when we determine the findings of guilty correct in law and fact. Here, the following factors are particularly significant to our decision:

1. The advertisements on Armed Forces television. The military judge found these commercials a central factor inducing the appellant to come to the Clark Air Base hospital and identify himself as an abuser. As the military judge noted in his findings, these advertisements informed the appellant that help (not a court-martial) was available. The advertisements were made

available to the trial forum, as well as to this Court in the form of a videotaped appellate exhibit. From their "hospitable" approach to abusers, we surmise they may have been designed for all members of the United States military forces in the Far East, rather than exclusively for Air Force members. We speculate that such is the case, based on reading materials pertaining to our sister services. We note that a form of "limited privilege" program exists for child abusers in the Marine Corps. *See United States v. Bell*, 28 M.J. 1062 (N.M.C. M.R.1989). In addition, there are reportedly "very few courts-martial in the Navy for crimes involving child sexual abuse;" and in the Army, only about one in six soldiers identified in substantiated child sexual abuse cases is said to face a court-martial for his crimes. *See* Arquilla, *Crime in the Home*, Army Lawyer 3, 10–11 (April 1988). Yet even if the advertisements represented something more "altruistic" to abusers than current Air Force policy, their premise (that military members could gain help rather than prosecution) was never countered by anyone in a position of authority in the Air Force. In short, when the advertisements were shown to viewers at Clark Air Base, nobody informed them that "this may not necessarily apply to you if you wear the blue suit ..."

2. The Social History Record when the appellant first sought treatment. This document gives every indication that the appellant's revelations would be held inviolate, that he had a right to expect privacy, and that only active duty members *referred by their unit* would find themselves involved with Article 31 and ultimately be reported back to their squadron commanders. The military judge admitted this Social History statement into evidence, largely upon the rationale that the appellant filled out the form voluntarily.[5]

---

4. We find pertinent the military judge's comment at trial: "Here we are over a year later sitting in a courtroom on a case that [sic] apparently the facts were all prepared in writing and disseminated to almost everybody in a position of authority on this base on the 21st of January last year."

5. Did the military judge correctly admit the Social History statement into evidence? We need not decide this matter in view of our disposition of the case. However, the military judge's approach in this difficult area is open to earnest doubt. *See United States v. McClelland*, 26 M.J. 504, 507 (A.C.M.R.1988). If the document was admissible, it would seem that the Security Po-

3. The action (and inaction) of those in positions of authority. We cannot avoid the fact that numerous responsible governmental representatives were involved with this case over an eight month period. We regard these individuals as experts on the commander's staff who were skilled in their professions. They had the implied authority to speak for the Air Force. Ms. Campbell testified that she spoke with agents of the Office of Special Investigations, both at the outset of the appellant's treatment and again after his daughter had been examined. OSI Special Agent Norris advised Ms. Campbell *that the OSI would not actively investigate the case.* Along the way, the Clark Air Base Child Abuse Committee selected a plan of attack in regard to the appellant. Again, we pause to emphasize that they were not intruders, but salaried Government agents engaging in a commendable function recognized and established by Air Force Regulation 160–38. Included on the Committee were representatives from both the OSI and the Staff Judge Advocate. Its minutes were approved by the commander, who was also the Special Court-martial Convening Authority. *See Satterfield v. Drew,* 17 M.J. 269, 273 (C.M.A.1984) (agency principles can apply to bind a convening authority even if he is not aware of exact character of such activity). Finally, it should be noted that the appellant's squadron commander and first sergeant knew of his involvement with child abuse ... though they did not know the rather serious details.

The chief Air Force contact with the appellant during his treatment was Ms. Campbell. Our reading of the record reveals a well-informed and responsible professional operating as best she could in the deplorable area of child abuse under the procedures set forth in AFR 160–38. She advised the appellant that if the Child Ad-

vocacy Committee decided on treatment rather than punitive action for these incidents, the Committee had the power to make that election. Indeed, Ms. Campbell specifically advised the appellant that if he continued in such "mandatory treatment" with Dr. Subervi, he would *not* be prosecuted. It is clear from her testimony that Ms. Campbell was "surprised and upset" when the appellant was ultimately brought before a court since she had advised him that he would not be prosecuted:

> Q. Did you tell him that he should not be prosecuted if the [Child Abuse] committee decided they would recommend that he should not be prosecuted?
>
> A. I told him that the committee makes that recommendation, because Legal sits on that meeting as well as OSI, and that if they did decide that it wouldn't be prosecuted that he would not—yeah, that he would not be prosecuted.

She also testified as to what she advised the members of the Child Advocacy committee:

> Q. [Before the Child Abuse committee] ... you advocated that the family go into treatment and Sergeant Spence go into treatment, that treatment be mandatory; is that correct?
>
> A. Yes.
>
> Q: And that you did so or you recommended that that treatment be done in lieu of prosecution?
>
> A: Yes.
>
> Q. And it was your understanding, based on protocol, based on other cases, that if that's what the Child Advocacy Committee recommended then that recommendation was good?
>
> A. That was my understanding.

And later:

> Q: Did you tell him that he wouldn't be prosecuted?

lice or Office of Special Investigations could create a form to be filled out by all visitors to their office. It might inquire of the purpose for the visit, perhaps suggesting categories for the visitor to check, such as an inquiry about becoming an agent, working as an informant, or even "getting something off your chest." Suppose the visitor completes the form with a statement such as, "I want to confess to smoking

marijuana." He is then given a proper Article 31 warning and leaves without opening his mouth. Depending on its precise content and structure, such a form might constitute "questioning" or "interrogation" within the meaning of Article 31 and thus require a prior rights advisement. We thus find it doubtful that his statement on the card could be used against him.

A: That he wouldn't be? I don't recall, but since that was my understanding, I probably—[sentence not completed by witness]

## A Caveat

We caution those reading this opinion to heed our admonition that today's holding is fact-specific. It might be useful to emphasize what we are NOT holding today. We are not holding that Air Force child abusers enjoy a "limited privilege" or can win a safe haven simply because they come in for treatment prior to their apprehension. We are not saying that the Air Force is barred from prosecuting such criminal behavior in the normal course of events. We are not seeking to clip the commander's authority to decline, in a timely fashion, the recommendations of his counsellors on the Child Abuse Committee and select punishment in lieu of, or along with, treatment.[6] What we are holding is simply this: *When competent Air Force officials appointed to deal with child abuse expressly or implicitly promise an individual for some eight months that he will be placed in therapy rather than prosecuted, we will enforce the promise. The Air Force cannot break its word.* See United States v. Churnovic, 22 M.J. 401, 405 (C.M.A.1986) and Federal and military cases cited; *United States v. Brown*, 13 M.J. at 259. *See also United States v. Koopman*, 20 M.J. 106, 109 (C.M. A.1985). In short, "the Government must abide by an agreement on which an accused has reasonably relied to his detriment." *United States v. Churnovic*, 22 M.J. at 405.[7]

---

**6.** The present case is easily distinguishable from *United States v. Beattie*, ACM 25938, 7 August 1987, wherein we held that television advertisements advising self-identification for child abusers created no limited immunity from prosecution. The facts here are vastly more favorable to the defense; in particular, the eight month timeframe serves to quickly distinguish this case from *Beattie*, where the advertisements, by themselves, did not create a reasonable expectation of immunity.

**7.** Our holding today obviates the need to consider numerous other issues inherent in the case which seriously militate against approving the appellant's conviction. Here, the military judge held that all statements to medical personnel were tainted because Ms. Campbell gave a defective Article 31 warning to the appellant. *See United States v. McClelland*, 26 M.J. 504, 508 (A.C.M.R.1988). As a result, three items of evidence were left to prove the case against this appellant: (a) his initial comments that he was abusing his child contained in the Social History Record which he filled out when he first presented himself at the hospital and *prior* to Ms. Campbell's defective warning; (b) the statement eight months later in which the appellant advised his commander that he had touched his daughter's genitals on several occasions; and (c) the child's statement, obtained by the hospital a few days after the appellant's conversation with Ms. Campbell.

What combination of (a), (b), and (c) is sufficient to convict the accused? One confession cannot corroborate another under Mil.R.Evid. 304(g); thus, it is clear that neither (a) nor (b) can corroborate the other. Thus, it appears that the Government needs either (a) *and/or* (b) *plus* the corroboration of (c) in order to make its case.

As for (a), we have discussed the problems inherent in admitting into evidence the Social History Record at note 5.

In regard to (b), we have serious reservations about whether the squadron commander gave a sufficiently cleansed warning so that the statement obtained from the appellant was admissible. As the Court of Military Appeals pointed out in *United States v. Ravenel*, 26 M.J. 344 (C.M.A.1988), Article 31 protections are wider than the protections of the Fifth Amendment, principally because of the uniquely coercive factors present in a military environment. It was for this reason that the Court did not consider *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), as outcome-determinative for the *Ravenel* case. We note that the appellant was not advised prior to his interview with his squadron commander that everything already obtained could not be used against him. The proverbial cat was unequivocally out of the bag when he was warned. Dr. Subervi, his therapist, had already spoken to the appellant's commander, and virtually everyone "in the know" on Clark Air Base was aware of the details of his case. Thus, appellant arguably was yielding to the inevitable when he spelled out the details to his commander—the only one who did not yet know such specifics. A "cleansing warning" is not a precondition to admissibility of the subsequently-obtained statement; however, it is a significant factor to consider. In short, there is a very strong argument that exclusion of the numerous statements to medical personnel compelled exclusion of the statement to the squadron commander. *See United States v. Nargi*, 2 M.J. 96, 99 (C.M.A.1977); *United States v. Angevine*, 16 M.J. 519, 520 (A.C.M.R. 1983).

Assuming for the sake of argument that either confession (a) or (b)—or both—are admissible,

A final matter: We caution those concerned with the problem of child abuse that there is no guarantee that this situation—wherein an appellant argues he gained a reasonable expectation after a lengthy period of time that he would not receive disciplinary punishment for his conduct—will not arise again. The difficulty in this case is that there was never a definite point at which authorities determined whether this appellant should be solely placed into treatment, subjected to disciplinary punishment, or both. We suggest that authorities working this area establish definite milestones under AFRs 160–12 and 160–38 to avoid such a problem in the future.

The findings and sentence in this case are set aside and the Charge and its specification are

DISMISSED.

Senior Judge LEWIS and Judge BLOMMERS concur.

we are far from convinced that (c) is available to provide sufficient corroboration. The military judge found corroboration in the statement of the appellant's daughter on the basis of "inevitable discovery." Factually, had the appellant walked out of the hospital after Ms. Campbell's caution, we are far from persuaded that authorities would "inevitably" have interviewed the child. We also speculate that had the family been called in and informed that Sergeant Spence was facing court-martial rather than therapy, they may well have refused to cooperate. When Captain Hagan, the first contact with the accused, spoke with the child, he believed the situation involved physical abuse, not sexual abuse. In this vein, the defense suggested to Ms. Campbell on cross-examination that military authorities likely would have learned nothing at all if the appellant initially had gotten up and walked out from their first interview. Ms. Campbell responded: "Right ... Yes, that's true." Furthermore, AFR 160–12, *Professional Policies and Procedures,* paragraph 53 (13 June 1985) provides for reporting serious cases of child abuse to the servicing OSI unit. Here, the matter was reported to the OSI—and that organization *declined to act.* We think these factors strongly militate against any "inevitability" of the matter further coming to the attention of Air Force authorities.

Legally, the theory of inevitable discovery finds its military lynchpin in *United States v.*

*Kozak,* 12 M.J. 389 (C.M.A.1982). In *Kozak,* the Court held that the prosecution must demonstrate, by a preponderance of the evidence, that "government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred." *United States v. Kozak,* 12 M.J. at 394. We have grave doubts that the Government has met the threshold test of *Kozak* here. *See United States v. Butner,* 15 M.J. 139 (C.M.A.1983) and *United States v. Haye,* 25 M.J. 849 (A.F.C.M.R.1988).

As a last resort, could the Government prove its case with (a) *and/or* (b) *plus* an "illegal" (c)? The argument might run thus: "The prosecution still prevails despite any other weakness in its case since it matters not how the Government came into possession of the corroborating statement of the stepdaughter; even if a statement is coercive or tainted, it still meets the relatively low threshold for corroboration under *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)." We think the argument must fail. *See United States v. Ravenel,* 26 M.J. at 350 (unique military rules; *Harris* inapplicable; statement obtained in violation of Article 31(b) inadmissible for all purposes).