**UNITED STATES**

v.

**Technical Sergeant Douglas H. CHICK, FR 461–08–4304, United States Air Force.**

**ACM 27997.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 18 July 1989.

Decided 9 March 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair; Captain Bernard E. Doyle, Jr. and Lieutenant Colonel Francis T. Lacey, U.S.A.F.R.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Terry M. Petrie and Captain James C. Sinwell.

Before BLOMMERS, KASTL and MURDOCK, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

The inevitable discovery rule is legal dynamite. Improperly used, it can blow the Fourth Amendment to smithereens. Judiciously applied, it can implement the rationale behind the exclusionary rule. The difficulty lies in applying the rule with suffi-cient discretion so as to satisfy both the rights of the individual and those of military society.

Technical Sergeant Chick challenges his conviction for wrongful possession of marijuana and drug paraphernalia on 5 May 1989. The sole basis upon which his conviction for those offenses can be justified is the theory of inevitable discovery. Here, upon the facts before us, we find the theory inapposite. We reverse his conviction for these offenses.

### Factual Setting

Chick's friend, Staff Sergeant Vega, was an informant for the Office of Special Investigations (OSI). On 4 May, Chick gave Vega a ride home; Vega asked if the appellant knew where Vega could buy a pound of marijuana. The appellant replied that he could obtain a quarter of a pound for $245.00. The next day, Chick informed Vega that the price would be $300.00 and that Vega could pick up the marijuana at Chick's off-base house in Austin, Texas. Prior to that transaction, Vega met with agents of the OSI. He was searched, briefed on the procedure to be used for the purchase, and given $300.00.

Inside the Chick home, the deal was completed. Chick received the $300.00 and Vega walked out with a plastic bag containing the marijuana. At this juncture, OSI agents—operating under a prearranged plan—pretended to "arrest" Vega in front of Chick's residence. Ordering Vega to lie on the ground, they handcuffed him and seized the marijuana.

Staff Sergeant Wales, who was assigned to the local OSI detachment, then knocked on the door and ordered Chick and his wife to step out of the house and lie on the ground. There was much general confusion, with Chick's dog barking loudly. Wales had a shotgun in his hands at the time. When Chick stepped outside, he was handcuffed and made to lie on the ground. Wales then asked if Chick would consent to a search of his home. Chick stated he wanted a lawyer but Wales replied that

there was no entitlement to an attorney on the issue of consent to search.

In the confusion of the moment, the on-the-scene OSI agents believed Chick had consented to a search. Entering the house, they found the $300.00 in currency given to Vega earlier. They also found .09 grams of suspected marijuana in an ashtray in the living room and .40 grams of suspected marijuana stems in the garage. In addition, they found a hemostat under the living room couch. The substance in question was confirmed to be marijuana; the hemostat was found to bear marijuana residue.

The military judge found that the appellant did not give a valid consent to search his house. However, the judge found that there would have been sufficient grounds to obtain a search warrant and that the OSI had acted under the mistaken belief that they had obtained Chick's consent to search. Under these circumstances, the military judge allowed the evidence to be introduced under the doctrine of inevitable discovery.

We hold that the military judge erred in his ruling.

### Inevitable Discovery

It was supposedly William Pitt who eloquently declared that:

The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement.[1]

The more sardonic might say that Mr. Pitt had never dreamed of the theory of inevitable discovery. In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court approved this precept as a matter of constitutional law. Inevitable discovery permits the introduc-

tion of either direct or derivative evidence in criminal trials despite police misconduct which normally would trigger the Fourth Amendment's exclusionary rule.

Even prior to the Supreme Court's adoption of inevitable discovery, the Court of Military Appeals had approved its application in military practice.[2] *See United States v. Kozak*, 12 M.J. 389 (C.M.A.1982). The current rule is at Mil.R.Evid. 311(b)(2). In *Kozak*, the Court observed that the inevitable discovery rule permits the prosecution to prove "that the evidence *would* have been discovered through legitimate means in the absence of official misconduct". 12 M.J. at 392 n. 7 (emphasis in original). *Kozak* emphasized that in applying this exception to the exclusionary rule, the prosecution must establish by a preponderance of the evidence that when the illegality occurred, government agents possessed (or were actively pursuing) evidence or leads that would inevitably have led to the discovery of the evidence and that the evidence would have been discovered in a lawful manner but for the illegality. 12 M.J. at 394.

The Court of Military Appeals has applied the doctrine cautiously. Thus, for example, in *United States v. Butner*, 15 M.J. 139, 143 (C.M.A.1983), the Court refused to find inevitable discovery applicable to the testimony of the appellant's accomplice.[3] For opposing interpretations of when the inevitable discovery rule is applicable, note the contrasting views of Judge Cox and Judge Sullivan in *United States v. Roa*, 24 M.J. 297, 300 n *, 303 (C.M.A.1987).

We too have applied the doctrine "carefully and narrowly." *See United States v. Haye*, 25 M.J. 849, 852 (A.F.C.M.R.1988). Although the factual setting was far different from that before us today, we explained that:

Because the information was not already in police hands, or being actively pursued by them, at the time the coerced

1. Quoted by Justice Brennan in *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958). The quotation also appears in *United States v. Morris*, 28 M.J. 8, 19 n. 5 (C.M.A.1989) (Judge COX, concurring in part and dissenting in part).

2. *See* Fennelly, *Inevitable Discovery; An Overview*, Army Lawyer, January 1988, p. 11.

3. *See also United States v. Wood*, 25 M.J. 46, 49 (C.M.A.1987).

statement was made, the [witness's] testimony does not fit the restrictive definition of *United States v. Kozak, supra. We are also unpersuaded that the [witness's] involvement, inevitably, would have come to official attention.*

25 M.J. at 852 (Emphasis added). *See also United States v. Cherry,* 759 F.2d 1196 (5th Cir.1985), for a representative case illustrating a parallel interpretation in Federal courts.

Subsequently, in *United States v. Tallon,* 28 M.J. 635 (A.F.C.M.R.1989), we commented that "absolute inevitability of discovery" was not required; it would suffice to ascertain "a reasonable probability that evidence in question would have been discovered from other than a tainted source." 28 M.J. at 639. *See also United States v. Spence,* 29 M.J. 630, 638 n. 7 (A.F.C.M.R. 1989) and *United States v. Carrubba,* 19 M.J. 896, 898 (A.C.M.R.1985) (Army Court's analysis of inevitable discovery).

### Analysis

As Professor LaFave points out in his distinguished treatise *Search and Seizure,* the reaction of legal scholars and jurists to the axiom of inevitable discovery has been mixed. *See* LaFave, *Search and Seizure,* Sec.' 11.4(a) (1987).

LaFave suggests that the concerns expressed by opponents of inevitable discovery ought to be respected. At the same time, he reasons that these arguments are not so much directed at the rule itself as at a loose and unthinking application thereof:

In carving out the inevitable discovery exception to the taint doctrine, he counsels, courts must wisely use "a surgeon's scalpel and not a meat axe." *Ibid.* He presses home two salient concerns in regard to this rule. First, he notes that mechanical application of the rule will encourage unconstitutional shortcuts—particularly if police bad faith exists. Second, he insists that the discovery must truly be one which is "inevitable"—and that means more than a mere hunch or speculation.[4]

### Application to the Present Case

■ After having reviewed the pertinent military precedents and considering the legal scholarship available, we are not convinced that it was in any way "inevitable" that the marijuana and hemostat would have been recovered from the appellant's house under a valid civilian warrant. The prosecution's logic fails to persuade us of inevitable discovery in two respects: (1) That a civilian magistrate would have issued a warrant in the first place; and (2) that the warrant would have been far-ranging, extending beyond Chick's wallet and the money paid by Vega to a search of the entire house for marijuana and drug paraphernalia.

Factually, we note that there was nothing concrete to suggest to authorities that marijuana was present in the house. No facts were developed to indicate that Chick was dealing in drugs from his home; that anyone had smoked there;[5] or that Vega

---

**4.** For further analysis, *see generally* Caseccio, *Illegally Acquired Information, Consent Searches, and Tainted Fruit,* 87 Col.L.Rev. 842, 852 (May 1987); Note, *The Inevitable-Discovery Exception to Exclusionary Rules,* 54 U.Cin.L. Rev.1987 (1986); Note, *The Inevitable Discovery Exception, Primary Evidence, and the Emasculation of the Fourth Amendment,* 55 Fordham L.Rev. 1221, 1224 (May 1987); Comment, *Nix v. Williams,* 70 Iowa L.Rev. 1369 (July 1985).

In regard to LaFave's concerns that police officials should not be encouraged to take shortcuts, the following testimony during the appellant's trial by an agent of the Office of Special Investigations might be considered pertinent:

Q [by Military Judge]: And although this buy had been set up using an informant [Vega] who had previously purchased, you

didn't feel that there was any cause to get a warrant prior to going into the house then?
A [by Agent G]: It would have been nice to get a warrant. Because of the time factor involved, that was a driving factor in our decision not to push for the warrant at that time.
Q: How long does it take to get a warrant?
A: I can't honestly say, sir.
Q: So you don't know whether the warrant could have been obtained or not? You just didn't even try to get one?
A: Well, we had briefly discussed it, but because of the chain of events—the time was moving so quickly, we decided just to press with the activity.

**5.** The record of trial indicates the appellant had smoked marijuana at a public recreation area

had seen other marijuana in the Chick house after his own deal had "gone down."[6] It is also significant to note that Chick had to go elsewhere to procure Vega's marijuana—there is no indication he had a cache of illegal substances at home. *See United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986); *United States v. Doile*, 244 Kan. 493, 769 P.2d 666, 672–673 (1989). Other cases are gathered at LaFave, *Search and Seizure* Sec. 3.7(d) (1987).

 Probable cause to search is established when information leads a reasonably prudent person to conclude that items properly the subject of search are located in the place to be searched; mere suspicion is an insufficient basis. *See United States v. Whiting*, 13 M.J. 804 (A.F.C.M.R.1982). Here, there was (at best) mere suspicion or speculation that contraband would be found in the Chick household. An official must have more than an inkling for a warrant to pass judicial muster. We find that the information was insufficient on these facts to lead a reasonable and cautious magistrate to issue a warrant for illegal substances in the Chick household. *See United States v. Tallon*, 28 M.J. at 638; *United States v. Whiting*, 13 M.J. 804, 806 (A.F.C.M.R.1982); *United States v. Racz*, 21 U.S.C.M.A. 24, 443 C.M.R. 78 (1971). *See also People v. Schoondermark*, 717 P.2d 504 (Colo.App.1985) and *New York v. Knapp*, 52 N.Y.2d 689, 439 N.Y.S.2d 871, 422 N.E.2d 531 (1981).

### *Remedy*

In the present case, the appellant entered a conditional guilty plea to possessing the marijuana and drug paraphernalia on 5 May addressed above. Based on our analysis, we disapprove the findings of guilty of those offenses and order Charge I, specification 3 and Charge II and its specification dismissed.

near Austin, Texas and outside the home of Vega's relative.

**6.** During his providence inquiry on distribution of the marijuana to Vega in return for the

The appellant pleaded guilty to other offenses—wrongful distribution of marijuana on 3 May and 5 May 1989 and wrongful use of marijuana over a nine month period. These offenses are unaffected by inevitable discovery; valid guilty pleas thus remain before us.

We approve the findings of guilty of specifications 1, 2, and 4 of Charge I and reassess the sentence. Only so much of the sentence as extends to a bad conduct discharge, confinement for 15 months, forfeiture of $466.00 pay per month for 15 months, and reduction to airman basic is approved.

The findings of guilty and the sentence, both as modified, are correct in law and fact and, on the basis of the entire record, are AFFIRMED.

Senior Judge BLOMMERS and Judge MURDOCK concur.

$300.00, the appellant indicated that the marijuana seized in his home "came out of the quarter pound" for Vega; "I took a little piece out."