UNITED STATES, Appellee,

v.

Larry L. CHURNOVIC, Jr., Fire Control Technician (Missiles) Third Class, U.S. Navy, Appellant.

No. 48912.
NMCM 83–2308.

U.S. Court of Military Appeals.

Sept. 22, 1986.

For Appellant: *Lieutenant Commander Harold M. Shaw,* JAGC, USNR (argued); *Lieutenant Commander William A. De-Cicco,* JAGC, USN and *Lieutenant Daniel Lippman,* JAGC, USNR (on brief).

For Appellee: *Major E.D. Clark,* USMC (argued); *Captain W. J. Hughes,* JAGC, USN and *Commander Richard A. Mon-*

teith, JAGC, USN (on brief); *Lieutenant Joseph G. Lee*, JAGC, USNR.

*Opinion*

EVERETT, Chief Judge:

Contrary to his pleas, appellant was convicted by a military judge sitting as a special court-martial of wrongfully using hashish on July 6, 7, and 8, 1982; wrongfully introducing 500 grams of hashish onto the USS OUELLET on July 5, 1982; wrongfully possessing 500 grams of hashish from July 7 to August 10, 1982; and wrongfully possessing hashish from July 5 to August 10, 1982, with intent to distribute.[1] The sentence adjudged was a bad-conduct discharge, confinement for 100 days, forfeiture of $350.00 pay per month for 3 months, and reduction to the grade of E-1. The convening authority approved the findings and sentence; the supervisory authority disapproved the findings of guilty of using hashish on July 6 and 8, but he otherwise approved the findings and sentence as adjudged and approved.

After the Court of Military Review affirmed the conviction and sentence in a per curiam opinion, we granted review of these issues:

I

WHETHER APPELLANT'S CONVICTION IS ILLEGAL AS A RESULT OF PRIOR COMMAND PROMISES OF IMMUNITY FROM PROSECUTION.

II

WHETHER APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION SHOULD HAVE BEEN GRANTED.

I

At the outset of appellant's trial, he moved to dismiss all charges by reason of a grant of immunity. Also, he moved to suppress evidence concerning the hashish and any statements that he had made because he

was entitled to Article 31 rights under the Uniform Code of Military Justice [10 U.S.C. § 831] and Rule 305 of the Military Rules of Evidence and the failure [o]f FTGC EUSEBIO to give these rights and further the promises and understanding extended to ... [him] by FTGC EUSEBIO and Special Agent WADDELL in these interviews not only rendered ... [his] statement involuntary but rendered them, ... all fruits of the poisonous tree.

FTGC Johnny M. Eusebio, who had been the leading chief petty officer aboard the USS OUELLET at the time of the alleged offenses, testified at length on these motions. He claimed that he had found an anonymous note in his box inquiring "if a person, ... giving information about drugs or whereabouts about drugs, something like that, or hashish will the person get in trouble." He tore up the note, because "I thought someone was pulling my leg."

[T]hen for the next few days I kind of asked some of the guys that I was involved with, counselling them about drugs. This, of course, counselling them about drugs all off the record. I mean I'm not saying I didn't have permission from the command to do such;it was just, I believe, [my] responsibility as a chief petty officer to these men on the OUELLET.

Later Eusebio went to discuss the note with the ship's executive officer and told him that "I believe it came from Petty Officer Churnovic." One basis for this belief was "the way the note is written."

The executive officer informed Eusebio "that the person wouldn't get in trouble if he turned in or if he got any information about hashish." As Chief Eusebio reiterated at various points in his testimony, he construed the remarks of the executive

1. Appellant was acquitted of use of marihuana on July 5 and 9, 1982. The charge of possession with intent to distribute was preferred under 21 U.S.C. § 841, as incorporated by the third clause of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934. The other charges were predicated on violations of Navy Regulations concerning use and possession of drugs, *see* Article 92, UCMJ, 10 U.S.C. § 892.

officer to mean that the person who turned in hashish would not receive a court-martial, non-judicial punishment, or any disciplinary action whatsoever.

Without administering any Article 31, 10 U.S.C. § 831 warning, Chief Eusebio next

approached Petty Officer Churnovic and in a long process I asked him about the hashish—or the note, okay. And then I talk[ed] more about the hashish, you know, someplace that the hashish is stashed and I said that I got confirmation from the XO that the guy wouldn't get in trouble.

\* \* \* \* \* \*

I told ... [him] that he wouldn't get in trouble from the XO, he wouldn't get in trouble, you know, going to mast. Just nothing would happen to him.

After Eusebio relayed to appellant the information he had received from the ship's executive officer, Churnovic told him "where the hash is stashed"; and Eusebio "went up there and I get it and it take me about 15–20 minutes to locate where he has it at." At that point, he did not "know whether it was ... Petty Officer Churnovic's hash." Chief Eusebio asked appellant "whose hash it might have been"; but appellant "didn't respond at all to the names of somebody else. He didn't respond any names but he didn't say who it belonged to but he said it not belong to him."

According to Eusebio's testimony, he took the hashish—500 grams in all—to the executive officer; and thereafter

I told Petty Officer Churnovic that I gave it to the XO and I told the XO—me and the XO discussed about him trying to get transferred from the ship because of fear of the other people might try to hurt him because of turning in the hashish, you know, the XO—so we talk about that and we talk about saying that as far as I'm concerned the XO won't—you're not gonna get in trouble and I also told him that one of these days the NIS is going to question you and so they're gonna question me too and a lot of other things, you know, on the hashish and off the hashish.

At that point, Eusebio assumed that appellant would be transferred off the ship but that, in any event, there would be no "punishment from the command." According to Eusebio, for the next few days "[e]verybody's happy; the command got the hashish, okay, which I feel real good about it and the command should and at that time I thought they would feel good about it and also Petty Officer Churnovic."

This euphoria was short-lived. Eusebio was informed by the executive officer that NIS would be questioning appellant and him. Moreover, the executive officer and Petty Officer Springs, who was acting chief master-at-arms, expressed to Eusebio their view that the hashish which had been turned in belonged to appellant.

NIS Special Agent Randall C. Waddell testified that he had interviewed Churnovic. At the outset, he had only considered Churnovic to be a witness, rather than a suspect. However, he soon became suspicious that appellant had owned the hashish; and so at that point in the interview, he advised him of his rights. Appellant then asked what would happen to him if it were determined that he had owned the hashish; and Waddell responded that this decision should be left up to command. The interview was terminated when appellant stated that he wanted to talk to Chief Eusebio. Two days later, appellant was reinterviewed by Agent Waddell and, after waiving his Article 31 rights, gave a written confession which acknowledged that he had owned the hashish. Churnovic also admitted use of hashish at various times in July 1982.

According to Waddell, Churnovic had never mentioned any promises or representations that anyone had made to him previously; and the special agent had informed appellant that he could not make any promises or give any assurances as to the disposition of any possible charges. Only after the interview with appellant did Waddell say that he would make a recommendation to command; and intentionally he did not inform Churnovic what that recommenda-

tion would be, because he did not want it misconstrued as a promise.

Subsequently Waddell talked to the executive officer and

made my recommendation to the command in that Petty Officer Churnovic had given this hashish to the command freely and voluntarily; he could have sold it, he could have given it to someone else. My belief is that he had a silent partner in the matter. He could have given it to his silent partner or he could have thrown it overboard, but nevertheless he elected to give it to the command and consideration should be given for that and for his cooperation—or in that he gave cooperation throughout the investigation for the most part that—and he had already admitted the culpability and there was no reason why the command shouldn't give him captain's mast.

The executive officer implied to Waddell that "he would give ... [appellant] captain's mast"; and Agent Waddell told Churnovic of this conversation. However, "[a]t a subsequent time apparently a decision was made not to honor that."

In ruling on the immunity issue, the military judge emphasized that when Chief Eusebio "indicated that nothing would happen to the accused if he turned the drugs in," he had not suspected that the drugs belonged to appellant. Indeed, "[h]e indicated, as a matter of fact, quite clearly that he was quite disappointed and shocked and felt betrayed when he found out in fact at a later time that the drugs did in fact belong to the accused." Accordingly, the military judge reasoned that, because Eusebio did not suspect that Churnovic possessed any drugs, he was not offering appellant immunity with respect to any charge of possession.

As to the motion to suppress, the judge concluded that Eusebio had no duty to administer any Article 31(b) warnings to appellant when they had discussed drugs initially because "[t]he testimony of the Chief does not, in the opinion of this court, support the defense contention that the Chief in fact thought the accused to be a sus-

pect." Likewise, Special Agent Waddell was under no duty to warn appellant when he began the interview because at that time he considered Churnovic to be only a witness, rather than a suspect. Then, "based on his experience, based on the answers the accused gave, [he] began to suspect that there was something more involved on behalf of the accused in merely turning in some drugs he knew about.... [H]e advised him of his rights and then went ahead and questioned him."

In affirming the conviction, the Court of Military Review had this to say with respect to appellant's contentions:

Appellant's assignments relating to an alleged "equitable" grant of immunity from prosecution for drug possession and use are without merit. It is apparent from the record that appellant's primary motivation for saying that he knew where hashish was hidden aboard ship was a ruse to be transferred "from harm's way" on the pretense of avoiding a reprisal from the "owner(s)" of the hashish. Prior to his voluntary confession to NIS, he had only revealed his status as a witness to the location of hashish aboard ship, and not his status as its owner. Accordingly, any representations made to him prior to his statement to the NIS were made to him in the status of a witness. One with "unclean hands" cannot prevail before the bar upon equitable principles.

Unpublished opinion at 2.

## II

On several occasions, this Court has rejected claims that prosecution was barred by an assurance given the accused that he would not be prosecuted. For example, in *United States v. Thompson,* 11 U.S.C.M.A. 252, 29 C.M.R. 68 (1960), a squadron commander's promise of immunity was held not to bind a convening authority, who neither knew of it nor authorized it. Likewise, in *United States v. Werthman,* 5 U.S.C.M.A. 440, 18 C.M.R. 64 (1955), the promise of a subordinate did not preclude a commander from instituting prosecution.

However, if an official authorized expressly or implicitly by the convening authority has promised a suspect that, in return for certain disclosures, he would not be prosecuted, we have not hesitated to enforce that promise. Thus, in *Cooke v. Orser*, 12 M.J. 335 (C.M.A.1982), a promise of immunity made by the staff judge advocate of the commander exercising general court-martial jurisdiction precluded prosecution of suspected espionage. Likewise, in *United States v. Brown*, 13 M.J. 253 (C.M.A.1982), this Court enforced an informal agreement that if the accused gave good information about drug activity, the convening authority would grant him some form of relief. There, the staff judge advocate had made the agreement; and he had been entrusted by the convening authority with that responsibility. Our conclusion was that the Government must abide by an agreement on which an accused has reasonably relied to his detriment.[2]

■ In the present case, the promise on which Churnovic relied was made by an enlisted person, Chief Eusebio. As we interpret the record, Eusebio was the senior enlisted person on the vessel; and quite appropriately he felt that he had a responsibility to rid the OUELLET of drugs. Significantly, Eusebio was in contact with the ship's executive officer and was authorized by that officer to make the promise to appellant. A logical inference from this record is that the executive officer and Eusebio were acting with the full knowledge and authorization of the OUELLET's captain, who typically would be the convening authority for a special court-martial to try drug offenses committed by members of the crew. Moreover, the Government offered no evidence from either the ship's executive officer or its captain to rebut the inference that Eusebio had acted within his authority.

Even if the ship's captain himself had promised immunity with respect to certain crimes, that promise would not have been binding. For example, a sailor suspected of murder or some other offense of similar gravity could not reasonably rely on a promise by his captain that, in return for information, he would not be prosecuted for the suspected crime. However, as we are aware, special courts-martial in the Navy frequently try offenses like those with which Churnovic was charged because of his introduction and possession of the hashish. Also, various types of immunity for those who come forward, confess drug activity, and seek rehabilitation are quite common in the Armed Services and elsewhere. Therefore, no reason exists why a promise of immunity cannot be enforced if it was made with express or tacit authorization from the ship's captain, who would convene special courts-martial to try members of his crew.

Even so, appellant was not entitled to dismissal of the charges arising out of his possession of the hashish unless it was unequivocally promised that, if he revealed the location of the drugs, he would not be prosecuted in connection therewith. The military judge could not discern such a promise. Apparently, he reasoned that, because Eusebio testified that he had not thought Churnovic owned the hashish, he was only assuring Churnovic that there would be no trouble if he disclosed the location of the hashish. Under this interpretation of the evidence, Eusebio was informing appellant that, as a witness, he would not be subject to prosecution—or perhaps was advising him that he would not be charged with dereliction of duties or violation of some Navy regulation, because of his prior failure to reveal the location of the hashish.

This restrictive interpretation of Eusebio's promise to appellant is hard to reconcile with the evidence. Appellant's initial

**2.** *Cf. Shepardson v. Roberts,* 14 M.J. 354, 355 (C.M.A.1983); *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *United States v. Rodman,* 519 F.2d 1058 (1st Cir.1975); *Rowe v. Griffin,* 497 F.Supp. 610 (D.Ala.1980), *aff'd,* 676 F.2d 524 (11th Cir.1982); *United States v. Martin,* 480 F.Supp. 880 (S.D.Tex.1979); *In the Matter of John Doe,* 410 F.Supp. 1163 (E.D. Mich.1976).

inquiry was whether someone—not necessarily himself—would be prosecuted upon disclosing the location of the hashish; and obviously, this hypothetical person could have been someone who owned the hashish. Furthermore, the distinction which the military judge sought to make was one which Chief Eusebio himself seems to have rejected, as in this colloquy with the trial counsel:

Q. So what we're talking about here is one person turning in someone else's drugs; isn't that correct?

A. Well, the note was in that way both is correct. Any information or any, you know, hashish on board.

Q. So it was your impression from this note—

DC: Objection, Your Honor, it's calling for an impression.

TC: It appears that the mind-set of this witness is the key.

MJ: I think so. The objection is overruled.

Q. So you're going, based on that note, we're talking about someone turning in someone else's drugs; isn't that correct?

A. Yes, sir.

Q. And when you mentioned the Executive Officer regarding this note you were talking about someone turning in someone else's drugs in, correct?

A. Or someone had any information about somebody else or drugs aboard the ship, yes, sir.

Q. And of course no one will get in trouble for turning in someone else's drugs; right?

A. Right, sir. *The XO also told me that if somebody turned in his drugs he won't get in trouble because he's turning it in.*

(Emphasis added.)

The inclusiveness of the promise was indicated later in the trial when Eusebio said that "the substance of" his conversation with Churnovic was:

Well, we'd talked about other things and we'd talked about the hashish, and I asked him if—well, not asked him, but what I'm say—I said "If anybody knows any information about drugs and he showed this information to me or to anybody else, and it has come from the XO that he won't get in trouble.

The military judge's interpretation that Eusebio did not suspect that appellant owned the hashish which he was surrendering also does not fully accord with the testimony. Clearly, Eusebio had some reasonable basis for suspicion because appellant previously had consulted him about obtaining rehabilitation for his drug problem. In any event, Eusebio testified that he had been "roughly 30% suspicious of Petty Officer Churnovic's personal involvement with the hashish and 70% unsuspecting," although he had not been concerned with any suspicion "because my desire to get the drugs off the ship is too overwhelming to think about any other things at that time." In short, Eusebio did not testify that he was sure that any drugs appellant might turn in belonged to someone else. Instead, he was emphasizing that the ownership of the drugs was immaterial "because just like I told you knowing about the hashish I just wanted to get the hashish off the ship, no matter what it takes so I wanted to take that damn hash off the ship."

Just as there is little basis in the record to support the military judge's view that appellant was never promised immunity with respect to possession of drugs, it is unclear on what evidence the Court of Military Review relied in finding it "apparent from the record that appellant's primary motivation for saying that he knew where hashish was hidden aboard ship was a ruse to be transferred 'from harm's way' on the pretense of avoiding a reprisal from the 'owner(s)' of the hashish." If the court below meant that Churnovic had formulated a plan pursuant to which he acquired the 500 grams of marihuana and then revealed its location in order to obtain a transfer, this explanation of his conduct seems far from "apparent." At least as tenable is the explanation which Eusebio seems to have accepted—namely, that

Churnovic was seeking help for the drug problem he had previously discussed with the chief.

Regardless of Churnovic's motivation, if he was promised immunity from prosecution for possessing hashish in return for revealing its location and if he provided the requested information, he is entitled to the benefit of that promise. There is no evidence that appellant extracted the promise of immunity by fraud. Furthermore, contrary to the view of the Court of the Military Review, there is no showing that his hands were "unclean." Indeed, his cooperation with Special Agent Waddell—who knew nothing of the previous promise made by Eusebio—was of such a nature that the investigator independently recommended that appellant receive no more than nonjudicial punishment.

Care should be taken in making promises of immunity; and typically investigators will wish to grant only testimonial, rather than transactional, immunity. However, once made, the promise should be complied with by the Government, rather than evaded on technical grounds. Otherwise, it is unlikely "that in the future similar promises will be relied on by those who are asked to furnish information." *Cooke v. Ellis*, 12 M.J. 17, 20 (C.M.A.1981) (Everett, C.J., dissenting) (footnote omitted). The reality of this danger is evidenced here by this testimony of Chief Eusebio:

> And I was promised by the people up there, in the chain of command on the ship, that nothing will get him in trouble and that that thing was thrown off the side. *If I'm going to do it again, I won't do it again. . . . I will have nothing to do with similar cases as we got right here.* I think it's a shame for the Navy to condemn a guy when the person that they're condemning is reaching out for help.

(Emphasis added.)

Despite the strong basis in the record for appellant's contention that there was a binding promise of transactional immunity as to the charge of possession of hashish, we are reluctant to rule on that issue on this record. For one thing, the record does not contain testimony of the OUELLET's captain and executive officer as to what authority, if any, they vested in Eusebio; and his testimony in this regard is at points rather confusing. Because the defense had the burden of establishing the existence of a binding promise of transactional immunity, some of the responsibility for omissions in the record shall be placed at appellant's door. Secondly, even if the claim of transactional immunity were upheld, it would not dispose of the offenses of use for which Churnovic was also convicted.

However, we conclude that the record contains a separate basis for reversal which applies to *all* the charges—namely, inadmissibility of the statements made by appellant to Eusebio and to Special Agent Waddell and of evidence derived therefrom.

### III

When a military investigator fails to give a suspect the warning required under Article 31(b), he has rendered inadmissible any statement that may result in any evidence derived therefrom. *Cf. United States v. Haynes*, 9 U.S.C.M.A. 792, 27 C.M.R. 60 (1958). The practical effect is like that of granting testimonial immunity.[3]

As we have already pointed out, Eusebio himself testified that he had a 30% suspicion that Churnovic might be the owner of the hashish whose whereabouts he apparently knew. Although the conversations between appellant and Eusebio were informal, they did not fall within the scope of *United States v. Duga*, 10 M.J. 206 (C.M.A.1981); clearly, Eusebio believed that he was fulfilling an official responsibility in obtaining information about drug use on the ship, and appellant was aware of this responsibility.

---

**3.** We understand there have been occasions when investigators deliberately failed to warn the suspect and informed him that any statement he made could not be used against him as evidence because of the absence of a warning.

Eusebio cannot be faulted for failing to give the warning. He was not thinking of any future court-martial because he had received his executive officer's assurance that, if the drugs were turned in, no prosecution would result. However, Eusebio's good faith in failing to give appellant an Article 31(b) warning does not justify the reception into evidence of statements made by appellant to Eusebio.

■ Even apart from Eusebio's failure to give a warning, any statement made to him by Churnovic could not be used against appellant in a trial by court-martial. The assurances given to appellant encompassed a promise that his statements would not be used against him as evidence in a trial. Regardless of the authority of an investigator to make such a promise, it, too, usually is enforcible for much the same reasons that apply to promises of transactional immunity. *United States v. Haynes, supra; United States v. Washington*, 9 U.S.C. M.A. 131, 25 C.M.R. 393 (1958); *United States v. Cudd*, 6 U.S.C.M.A. 630, 20 C.M.R. 346 (1956). Indeed, use of such a promise to obtain a statement but not honoring that promise constitutes an "unlawful inducement" for purposes of Article 31(d).

Appellant's statements to Eusebio included information as to the location of the hashish on the OUELLET. Because Eusebio found the hashish as the direct result of this disclosure, the hashish itself would seem subject to exclusion as derivative evidence. Indeed, even if appellant had physically delivered the hashish to Eusebio, the delivery would itself be a statement, so evidence of the delivery would be inadmissible along with the item delivered. *Cf. United States v. Armstrong*, 4 U.S.C.M.A. 248, 15 C.M.R. 248 (1954).

■ The statements to Agent Waddell were made two days after the hashish was disclosed by Churnovic. Waddell claimed that he had not considered Churnovic a "suspect," so initially he had not warned

him of his rights under Article 31(b).[4] Inasmuch as Waddell made no promises to appellant and did not violate Article 31(b), the statements he took were not tainted by any action on his part. Moreover, like the Supreme Court, we shall not apply a "cat-out-of-the-bag" theory—namely, that because Churnovic confessed to one person, he inevitably would confess to others.

Nonetheless, despite due deference to *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), it is clear that here the original unwarned statements to Eusebio directly produced the later statements to Waddell. The relationship in time and place is too close to allow reception of the later statement. Clearly the later statement would never have been made if earlier Churnovic had not made his inadmissible statement to Eusebio disclosing the exact location of the hashish.

## IV

All the charges in the Government's case depended on evidence which was inadmissible.

The decision of the United States Navy-Marine Corps Court of Military Review is reversed; and the findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that Court for action consistent with this opinion.

Judge SULLIVAN did not participate.

COX, Judge (concurring in the result):

It is fundamental, black letter law that a confession must be freely and voluntarily given—a product of the accused's unfettered will to confess—in order for it to be admissible as evidence in court. *See Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Culombe v. Connecticut*, 367 U.S.

---

4. Because the executive officer and acting master-at-arms told Eusebio that they thought appellant owned the hashish, it is rather surprising

that Waddell was not informed by them of their suspicions, in which event presumably he would have warned appellant.

568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.). Article 31(d), Uniform Code of Military Justice, 10 U.S.C. § 831(d), reflects the same rule: "No statement obtained ... through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence." Mil.R.Evid. 304(c)(3) defines an "involuntary statement" as one that "is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." A consent to search must likewise be voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

As I view the issues presented in the instant case, the question we must resolve is whether the accused's decision to reveal the location of the drugs and confess to his involvement with them was "the product of an essentially free and unconstrained choice." *Id.* at 225, 93 S.Ct. at 2047. As the principal opinion points out, the accused revealed the drugs and confessed his involvement therewith because he relied on Chief Eusebio's representation that he "was promised by the people up there, in the chain of command on the ship, that nothing will get him in trouble" as an inducement to speak. *See United States v. Dalrymple*, 14 U.S.C.M.A. 307, 34 C.M.R. 87 (1963).

Based on the facts and circumstances surrounding the confession and the seizure of the drugs, I conclude that the military judge erred by failing to grant the defense motion to suppress the evidence. Such error is not harmless by any standard; accordingly, I join Chief Judge Everett's disposition of this case.