## UNITED STATES

### v.

### Sergeant George A. WAGNER, FR138–52–6605 United States Air Force.

### ACM 29186.

U.S. Air Force Court of Military Review.

Sentence Adjudged 22 Dec. 1990.

Decided 2 Sept. 1992.

Appellate Counsel for the Appellant: Captain Michael D. Burt (argued) and Colonel Jeffrey R. Owens.

Appellate Counsel for the United States: Major Jeffrey C. Lindquist (argued), Colonel William R. Dugan, Jr., Lieutenant Colonel Brenda J. Hollis, Major Paul H. Blackwell, Jr., Major Ann M. Mittermeyer, and Captain Carlos L. McDade.

Before DIXON, PRATT, and McLAUTHLIN, Appellate Military Judges.

### OPINION OF THE COURT

PRATT, Senior Judge:

This case presents the question whether the appellant, Sergeant George A. Wagner, had been granted *de facto* immunity from prosecution by the actions of the government in the wake of his self-identification for child sexual abuse. We hold that he had, and dismiss the charges and specifications.[1]

### I.  Facts

On Memorial Day weekend in late May of 1989, Sergeant Wagner's wife discovered that he had sexually abused his 3–year–old stepdaughter and his 18–month–old natural daughter. The abuse transpired over a 4–month period and involved mainly the stepdaughter. On reportedly about a dozen occasions during that time period, Wagner abused the 3–year–old in one of several ways. Usually, he would lay down on the floor next to her, remove her clothes, fondle her vaginal area with his hand, remove all or part of his clothing, and continue to

---

1. Pursuant to conditional pleas of guilty at a general court-martial, appellant was convicted of committing indecent acts upon his 3–year–old stepdaughter and his 18–month–old natural daughter and engaging in sodomy with the former. Court members sentenced appellant to a dishonorable discharge, confinement for 18 years, forfeiture of $200 pay per month for 60 months, and reduction to E–1. The convening authority removed the forfeitures, reduced the period of confinement to 12 years, and approved the remainder of the sentence.

fondle her until he went into the bathroom and ejaculated. On one such occasion, his 18–month–old wandered into the room and seemed to vie for his attention. In response, he rubbed her vaginal area for about 10 seconds. On another occasion, as he sat on the toilet, he called the 3–year–old to him and placed her hands on his erect penis, having her move her hands up and down. When she stopped, he finished masturbating in her presence and told her that his ejaculate was "Daddy's milk." On three occasions, he had her kiss the tip of his penis.

Immediately after admitting these matters to his wife, Wagner voluntarily left the home and checked into the base billeting facility. When the holiday weekend ended, he sought help from the on-duty chaplain. On a referral from the chaplain and, in turn, the family services organization, Wagner reported to the Mental Health Clinic where he spoke with a Mr. Waltz, the base Family Advocacy Officer. He related to Waltz that he had been sexually fondling his 3–year–old stepdaughter. Not viewing himself as an investigator, Mr. Waltz never questioned Wagner about the nature or extent of the abuse other than to ask if any penetration had occurred, to which Wagner truthfully answered, "No."[2] Wagner did not elaborate, but simply answered the specific questions he was asked. Mr. Waltz informed Wagner that these matters could not be held in confidence, that a family advocacy case file would be started, and that certain notifications would have to be made. Mr. Waltz then referred Wagner to an off-base civilian agency, Parents Assistance Center, for counseling and therapy.

Thereafter, Mr. Waltz made the appropriate notifications to the Office of Special Investigations (OSI), to Wagner's commander, Lieutenant Colonel Favela, and to the local Department of Human Services. Mr. Waltz was understandably impressed by the fact that Wagner had self-identified, had voluntarily removed himself from immediate access to the victim, and was actively seeking help for his psychological problem; all three vitally important responses to abuse situations, but all three rarely recognized and voluntarily undertaken by the abuser himself.

This favorable impression was apparently conveyed by Mr. Waltz when he made his notifications. The OSI detachment commander testified that Waltz, in the process of discussing the matter, recommended that no further investigative follow-up was required, given Wagner's willingness to attend counseling. OSI did not, in fact, open an investigation to determine the exact scope of Wagner's misconduct, and did not interview or seek to interview Wagner or his wife or his stepdaughter. Instead, after consulting with the OSI district headquarters and the staff judge advocate, the OSI detachment commander simply "zeroed out" the report of this matter.[3] Similarly, Colonel Favela, Wagner's commander, seemed satisfied with Mr. Waltz's assessment of the situation:

A. [W]hat I do distinctly remember is calling Mr. Waltz at Mental Health concerning Sergeant Wagner's situation and asking him what was going on. He, in turn, told me that Sergeant Wagner had come in looking for help saying that he had been molesting his stepdaughter. Based on that situation and talking to Sergeant Wagner—also I asked have you notified the OSI about this because knowing that this is a serious offense and my knowledge of being a commander—I know you must contact the OSI. He indicated he had contacted the OSI about the situation.

Q. Did you ever contact the OSI yourself?

A. I cannot remember whether or not I talked with the OSI or not on this

---

2. We recognize that the sodomy offense, which consisted of the 3-year-old kissing the tip of Wagner's penis on several occasions, involved penetration in the legal sense of the word. However, we would not expect Wagner, at the time he spoke with Mr. Waltz, to perceive his conduct as having included penetration.

3. "Zeroing out" a report, from the context here, suggests that a record is made of the reported incident but no active investigative effort is deemed necessary or appropriate at that time.

situation. There are occasions I have talked to the OSI, but whether I did or not, but I do recall though that the OSI was contacted through Mr. Waltz or myself, either or, and the OSI indicated there was no interest in this in terms that charges would be filed on this. This is what I was particularly concerned about—Were there any criminal charges or anything like that where he had done any wrongdoing? Apparently, Mr. Waltz indicated there was no— it wasn't serious enough for them to make an issue of it and file charges in this situation.

Finally, the Department of Human Services assigned a social worker to the case and monitored Wagner's progress through the Parents Assistance Center. No civilian charges were ever brought against Wagner.

Just a few days after Wagner's self-identification, Colonel Favela discussed the matter with Wagner in the presence of Master Sergeant Kelly, the squadron first sergeant. Wagner testified that he perceived from the meeting that Colonel Favela had promised "[a]s long as I was getting treatment, then he would see fit to allow me to continue my duties." Although Colonel Favela had difficulty remembering a specific conversation with Wagner on the subject, Master Sergeant Kelly recalled it quite clearly:

Q. Why was he called into the commander's office?

A. Because the commander wanted to talk to him and find out exactly what was happening and see what we needed to do—what course of action we needed to take.

Q. What happened when he came into the office?

A. Colonel Favela told him that he had been in touch with Mental Health and what he was going to do was make sure he got some type of treatment, but if this ever happened again or if he ever touched another kid, it would be all over for him—his career would be over.

Q. So he effectively told him nothing was going to happen as long as he got treatment?

A. Yes.

Q. As long as it didn't happen again?

A. Right.

Neither Colonel Favela nor Master Sergeant Kelly ever asked Wagner for specific details of the abuse, relying instead on what they had been told by Mr. Waltz.

In mid-June, in a letter to the base housing office and, in turn, to the deputy base commander, Colonel Favela recommended that Wagner's family be approved for larger base quarters to alleviate family stresses. In the letter, Colonel Favela acknowledged the criminal nature of Wagner's behavior, but stated his willingness "to give him the opportunity to be rehabilitated and to return as a mission-ready AWAC crew member." A few months later, in September 1989, after receiving a positive recommendation from Mr. Waltz, Colonel Favela arranged to have Wagner's security clearance reinstated, returned him to flying status, and allowed him to resume his original duties.

Prior to beginning therapy, Wagner sought the advice of a military defense counsel and was advised that, in light of his meeting with Colonel Favela, it appeared to be safe for him to cooperate with investigators and therapists. From the outset, Wagner and his wife began receiving marriage counseling from a civilian social worker, Ms. Slentz. This counseling continued through October 1989.[4] On referral from Mr. Waltz, Wagner gained admission to the child abuse treatment program at the local Parents Assistance Center (PAC), in which he participated until March 1990. By December 1989, Wagner's wife had established a relationship with another man and informed Wagner that she intended to divorce him. As a result of the stresses

---

4. The Wagners had been receiving this counseling on a CHAMPUS referral for Mrs. Wagner. When Mrs. Wagner refused to attend further sessions, CHAMPUS rules reportedly allowed Wagner only four additional "collateral" visits. Wagner testified that he could not afford the full cost of continued counseling after that time.

associated with this event, Wagner began receiving individual counseling from a clinical social worker, Mrs. Pate, at the base Mental Health Clinic. Wagner continued this counseling on a regular basis through October 1990 and, at Mrs. Pate's suggestion, he also attended group therapy sessions for adults from dysfunctional families starting in August 1990.

In March 1990, Wagner faced a dilemma regarding his continued participation in the PAC treatment program. Although Wagner, his commander, and the first sergeant all recall the matter a bit differently, all agree that Wagner raised a two-fold concern: (1) the facilitators at PAC told him they would have to disenroll him from the treatment program if he left on a scheduled 4–week deployment to Iceland, and (2) as part of the therapy, he was being asked to videotape a reenactment of his offenses, a process he was afraid might pose a threat to his security clearance. Colonel Favela and the first sergeant were equally concerned about the possible impact on Wagner's security clearance, and they were anxious to have him participate in the upcoming deployment. So, in the first sergeant's words, "Colonel Favela informed him he could go ahead and take the TDY [temporary duty], but when he came back from [Iceland], he had to find some other type of counseling as long as he was getting treatment." In point of fact, upon his return, Wagner did not attend a substitute treatment program, as such. The only other program of that specific type was located in a town 20 miles away and, Wagner asserted, his car was "not road worthy enough to trust." He did, however, continue to attend both individual counseling with Mrs. Pate and, later, group therapy for dysfunctional families at the base Mental Health Clinic.

In July 1990, Wagner was selected for promotion to staff sergeant, to be effective 1 November 1990.[5] In September 1990, Wagner was recommended for reenlistment, with the recommending official certifying that Wagner "is not under investigation by military or civilian authorities, pending military or civil court charges, or pending punishment under the UCMJ." Ironically, a week later, after a heated argument with Wagner,[6] Mrs. Wagner contacted the OSI, complained about the lack of action on her husband's offenses, and an investigation was opened. Two days later, on 19 September 1990, Wagner was summoned to the OSI office and ultimately revealed the facts which resulted in his court-martial.

## II. Analysis

■ At trial, Wagner's defense counsel moved to dismiss the charges based on a contention that the statements and actions of Wagner's commander and other Air Force officials over the 15–month period since his original self-identification for child sexual abuse had created, in essence, a *de facto* immunity from prosecution for these offenses. After receiving extensive documentary and testimonial evidence on this issue, the military judge denied the motion.

Before this Court, the appellant reasserts his claim of *de facto* immunity. We will address each of the three bases underlying the government's claim that Wagner is *not* entitled to protection from prosecution.

### A. Forthrightness

At trial, in response to the defense motion to dismiss, the trial counsel argued that Wagner was not entitled to be protected from prosecution because he had been less than fully forthright with the government in identifying the extent of his abusive misconduct. Although he had admitted generally to fondling his 3–year–old stepdaughter, he had failed to mention hav-

---

5. The charges in this case were preferred on 17 October 1990.

6. Wagner testified that, despite regular alimony and child support payments, his ex-wife often came to him and sought additional money, which he gave her when he could. Sometimes, when he could not give her money, she would reportedly threaten to "press charges" for the child abuse. He stated that such an occasion occurred on 17 September 1990. On that day, when he refused to give her any additional money, she became extremely angry and stated that, if she had a knife, she could slit his throat.

ing her place her hands on his penis, masturbating in her presence, having her kiss his penis on three occasions, and the brief abusive touching of his 18–month–old daughter. This lack of full disclosure is said to undermine the validity of any *de facto* immunity. The military judge agreed, expressly relying on this Court's decision in *United States v. Kimble*, 30 M.J. 892 (A.F.C.M.R.1990). In *Kimble*, under similar factual circumstances, we held that the appellant was not entitled to enforcement of a *de facto* grant of immunity because he did not disclose the full extent of his abusive conduct and, thus, "did not deal forthrightly" with the government. *Id.* at 895. Although firm in our belief that "the Air Force cannot break its word" in such situations, *United States v. Spence*, 29 M.J. 630 (A.F.C.M.R.1989), we found that since the Air Force lacked crucial facts about the accused's abusive conduct, officials never made a "knowledgeable" election to forego prosecution. *Kimble*, 30 M.J. at 895.

Since the trial and the initial appellate defense brief in this case, the Court of Military Appeals has considered our holding in *Kimble* and reversed it. *United States v. Kimble*, 33 M.J. 284 (C.M.A.1991). Senior Judge Everett, writing for the Court (Judge Cox dissenting), held that Kimble was entitled to the benefit of his bargain:

> If the Government relied solely on *appellant's* version of events in making its decision and its subsequent promise— without any expression of a caveat that that version must have been accurate and complete—the Government proceeded at its own risk.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> [T]he failure of Air Force officials to be *"knowledgeable"* in making their promise was due to their own inattention and lack of even rudimentary investigation, not to appellant's deception.

*Id.* at 290, 291. This reversal of our earlier ruling in *Kimble* thoroughly undercuts the basis cited by the military judge for denying the defense motion to dismiss in the present case. Although Wagner, like Kimble, was not entirely forthright, it is readily apparent that the lack of knowledge on the part of the government was, in this case also, due to the government's own negligence. When Wagner initially self-identified to Mr. Waltz, he admitted fondling his 3–year–old on more than one occasion and, in response to questions by Mr. Waltz, truthfully denied any acts of penetration. As noted earlier, neither Mr. Waltz, nor Colonel Favela, nor Master Sergeant Kelly ever questioned Wagner further on the specifics of his actions. OSI, the Air Force's primary investigative agency for such offenses, elected not to question Wagner, his wife, or either of his children to determine the extent of the sexual abuse. Instead, relying on Mr. Waltz's recommendation and the information he possessed, OSI decided not to open an investigation, the staff judge advocate reportedly concurred, and Colonel Favela decided to make a deal with Wagner: offend no more, pursue counseling, and there will be no prosecution. In keeping with *Kimble*, the agreement will not now become unenforceable for lack of forthrightness.

### B. Lack of Authority

Having the benefit of the freshly decided *Kimble* decision before filing their reply brief, appellate government counsel present two alternative reasons why Wagner should not be entitled to protection from prosecution. The first of these reasons, they assert, is that Colonel Favela did not have authority to grant actual immunity or the capacity to engender a *de facto* immunity.

While appellate government counsel seem to acknowledge, or at least demur to, the existence of an agreement between Wagner and Colonel Favela, they argue that Colonel Favela simply lacked the authority to bind the government to any promise of immunity. At first blush, this assertion seems unassailable and dispositive of this issue. Indeed, immunity under military law has generally been limited to formal grants by a general court-martial convening authority. R.C.M. 704(c), Manual For Courts–Martial, United States, 1984, provides that "[o]nly a general court-martial convening authority may grant im-

munity, and may do so only in accordance with this rule." R.C.M. 704(c)(3) specifies that this authority may not be delegated. As long as three decades ago, the Court of Military Appeals determined that a unit commander's promise of immunity could not bind a general court-martial convening authority who neither directs it, knows of it, nor authorizes it. *United States v. Thompson,* 11 U.S.C.M.A. 252, 29 C.M.R. 68 (1960). Since *Thompson,* however, this principle has not been quite so rigidly applied, leading even appellate government counsel to acknowledge in their brief that "the law in this area is not so simple."

■ As noted in the *Kimble* decision, the language in the Discussion section of R.C.M. 704(c) itself mirrors the case law development. After repeating the principle that only general court-martial convening authorities are authorized to grant immunity, the Discussion states:

> However, in some circumstances, when a person testifies or makes statements pursuant to a promise of immunity, or a similar promise, by a person with apparent authority to make it, such testimony or statements and evidence derived from them *may be inadmissible* in a later trial.

(Emphasis added.) This language reflects the position taken by the Court in *Thompson* and, essentially, by Judge Cox in his dissent in *Kimble:* A person either has authority to grant immunity or he does not. If he does not, but an accused relies to his detriment on such apparent authority, the remedy is to suppress any statement or other evidence which resulted from the defective promise. *See also, e.g., United States v. Caliendo,* 13 U.S.C.M.A. 405, 32 C.M.R. 405 (1962).

But the Discussion section of R.C.M. 704(c) goes one step further, adding:

> Under some circumstances a promise of immunity by someone other than a general court-martial convening authority *may bar prosecution altogether.* Persons not authorized to grant immunity should exercise care when dealing with accused or suspects to avoid inadvertent-

ly causing statements to be inadmissible *or prosecution to be barred.*

(Emphasis added.) Indeed, there have been a series of cases in which an unauthorized promise of immunity has nevertheless been enforced. *United States v. Kimble,* supra; *United States v. Churnovic,* 22 M.J. 401 (C.M.A.1986); *United States v. Koopman,* 20 M.J. 106 (C.M.A.1985); *United States v. Brown,* 13 M.J. 253 (C.M.A.1982); *Cooke v. Orser,* 12 M.J. 335 (C.M.A.1982); *United States v. Spence, supra.* While the government correctly asserts that the courts typically fashion some sort of "link" between the promising official and the general court-martial convening authority sufficient to suggest a tacit or inferred delegation, authorization, or approval, this link has at times been somewhat thin.

In *United States v. Churnovic, supra,* a Navy petty officer relied upon assurances from the ship's leading chief petty officer that he would not be disciplined if he turned in drugs or information about drugs. In *Kimble,* Senior Judge Everett discussed the *Churnovic* decision at some length, noting the efforts made in that case to "trace" authorization for the promise of immunity:

> Tracing the "authorization" in that case, we began with the leading chief (who was the senior enlisted person on board); moved to the executive officer with whom the chief had conferred; and then drew the "logical inference," in the absence of any government evidence to the contrary, that the two of them "were acting with the full knowledge and authorization of the ... [ship's] captain...."

Of course, even this "logical inference" got only as far as the ship's captain, who was a *special* court-martial convening authority. We observed, however, that the offense involved in that case was one that typically would be tried by a special court-martial, not a general court-martial. "Also," we noted, "various types of immunity for those who come forward, confess drug activity, and seek rehabilitation are quite common in the Armed Forces and elsewhere. Therefore, no reason exists why a promise of immunity

cannot be enforced if it was made with the express or tacit authorization from the ship's captain, who would convene special courts-martial to· try members of his crew." 22 M.J. at 405.

*Kimble, supra,* at 292.

In *United States v. Spence, supra,* a case closely paralleling this one, the "promise" was made by a civilian social worker at the base Family Advocacy Clinic. After the Child Advocacy Committee assessed the accused's case and decided that mandatory treatment was appropriate, the social worker assured the accused that he would not be prosecuted if he continued with mandatory treatment. After the accused relied on this "promise" for 8 months, this Court found that "[t]he Air Force cannot break its word." *Id.* at 637. Part of the rationale for that determination stemmed from the fact that the Child Advocacy Committee was comprised of representatives from the legal office, OSI, and various other agencies, and its meeting minutes were reviewed and signed by the special court-martial convening authority. Citing *Churnovic,* and without any further "tracing," this Court enforced the promise.

In *Kimble,* involving a similar child abuse situation, the promise of immunity was made by the special court-martial convening authority. After discussing the rationale in *Churnovic,* the Court demonstrated once again its willingness, under the right circumstances, to enforce a promise of immunity despite the lack of established authorization or adoption by the general court-martial convening authority:

> Thus, as in *Churnovic,* it is not entirely clear that, when the special court-martial convening authority made his promise of immunity, he did so without at least the tacit authorization of the general court-martial convening authority.

> Fundamentally, however, what military officials at all levels must keep in mind is this: Regardless whether the promise be one formally of immunity pursuant to RCM 704, or whether it be one that induces the accused into making incriminating admissions as in Churnovic, or whether it is one that in some way is relied upon by an accused to his detriment, due process requires that the accused get the benefit of his bargain. See Cooke v. Orser, supra.

*Kimble, supra,* at 293 (emphasis added).

Applying the lessons of *Kimble, Spence, Churnovic,* et al. to the present case, we have little difficulty determining that Wagner is entitled to the benefit of his bargain. By general regulation, the Air Force has established policies and programs for dealing with child sexual abuse, set out and implemented in Air Force Regulation 160–38, *Family Advocacy Program* (9 January 1989). Although no formal family or child advocacy committee reviewed this case,[7] the "processing" of his case was participated in by most of the representatives who would likely have been the principal members of such a committee (OSI, staff judge advocate, mental health, family advocacy officer). As we stated in *Spence,* these officials were agents of the Air Force—no more and no less. They are key advisors to the special court-martial convening authority. After due coordination amongst these key officials, Wagner's commander called him in and made a deal: no more abuse, get treatment, no prosecution. For the next 15 months, the Air Force, through a variety of agents and processes, gave Wagner repeated indications that his case would not be the subject of a prosecution—his family was approved for larger base quarters, his security clearance was reinstated, he was returned to flying status, he resumed his original duties includ-

---

7. Mr. Waltz, the Family Advocacy Officer, testified that he could not recall any family advocacy meetings being held during the general timeframe of Wagner's self-identification. There is no explanation for this lapse. Under the provisions of AFR 160–38, a Family Advocacy Committee should have been in existence and should have, in turn, established a Family Maltreatment Case Management Team (FMCMT), chaired by the Family Advocacy Officer, to assess and "manage" all reported cases of family maltreatment. In cases involving child sexual abuse, the FMCMT is to review each case monthly. AFR 160–38, *Family Advocacy Program,* paragraph 37 (9 January 1989). Had this program been properly applied, it is likely that many of the problems which arose in this situation could have been avoided.

ing extended TDY's, he was approved for reenlistment, and he was even selected for promotion. In reliance upon the "deal," Wagner continued his voluntary absence from his household, actively pursued a variety of avenues for treatment and counseling, successfully requalified as an air crew member, resumed his normal duties, tested for promotion, and significantly, did *not* seek to separate from the service.[8]

No one factor singularly transforms the unit commander's unauthorized promise of immunity into an enforceable bar to prosecution; it is the totality of the many events and circumstances which led Wagner to reasonably believe that prosecution would not be forthcoming and, notably, the length of time he was allowed to harbor that belief and act in reliance thereon. Arguably, a "tracing" of authorization in this case would need to be no more creative than that performed in *Kimble, Churnovic,* and *Spence.* But, above all, the circumstances of this case constitute a situation in which fairness and due process require that Wagner "get the benefit of his bargain." *Kimble, supra,* at 293. As this Court said in *Spence:*

> What we are holding is simply this: *When competent Air Force officials appointed to deal with child abuse expressly or implicitly promise an individual for some eight months that he will be placed in therapy rather than prosecuted, we will enforce the promise. The Air Force cannot break its word.*

*Spence, supra,* at 637 (emphasis in original).

### C. Agreement Breached?

In a final assault on Wagner's claim of *de facto* immunity, the government contends that Wagner did not satisfactorily perform his part of the agreement, thereby releasing the government from the promise not to prosecute. Specifically, the government asserts that Wagner breached the agreement when he failed to resume counseling for child sexual abuse upon his return from his TDY to Iceland. We disagree.

A careful reading of this record leads us to the inescapable conclusion that the degree of crisp, clear, legalistic *quid pro quo* which both trial and appellate counsel have attempted to impose on the "deal" in this case considerably outstrips, and eventually distorts, the likely reality of the situation as it occurred. We have had to piece together the "terms" of the deal from the non-specific testimony of Colonel Favela, the interpretations of Master Sergeant Kelly, and the perceptions of Wagner himself. What we arrive at, after sifting the testimony through a lawyer's sieve, is a promise not to prosecute if Wagner refrains from further abuse and gets treatment. Markedly absent from anyone's account are details as to the specific treatment program or type of treatment required to satisfy the agreement, the length of time or other "trigger" which will signify that the agreement has been fully satisfied (i.e., that the promise not to prosecute vests), the means by which satisfactory compliance with the agreement will be determined over time, etc. It is fair to assume that Colonel Favela had been informed of Wagner's referral to the PAC treatment program and, initially at least, contemplated that Wagner would pursue treatment through that program. The point is, however, that the parties did not formalize these matters.

As detailed earlier, when Wagner determined that the PAC program threatened both his security clearance and his participation in an upcoming deployment to Iceland, he took his concerns to the commander, through the first sergeant. Colonel Favela shared Wagner's concerns and agreed that he should terminate his partic-

---

**8.** Wagner was originally scheduled to reenlist on 14 September 1990, 3 days *before* his wife complained to the OSI and, thus, generated an investigation. For administrative reasons, however, he had rescheduled his reenlistment for 26 September. Once the investigation was opened, of course, he was unable to reenlist. Had he found a way to separate from the service before the OSI investigation was initiated, of course, he would no longer have been subject to military jurisdiction.

ipation in the PAC program in March 1990.[9] The record is unclear on the exact circumstances of this decision. Colonel Favela was questioned about his concerns, but was never asked to recount whether he talked directly to Wagner and, if so, exactly what he said. Kelly seems to recall a meeting between he, Wagner, and Colonel Favela, at which "Colonel Favela informed him he could go ahead and take the TDY, but when he came back from Keflavik, he had to find some other type of counseling as long as he was getting treatment." Wagner, both in his statement to OSI and his testimony on the motion, indicates that he never spoke directly with the commander on this issue, but coordinated with the squadron through the first sergeant:

Q. Now, about this decision to drop out of the PAC Program, you said you talked to Sergeant Kelly about it. Is that correct?

A. Yes, Ma'am.

Q. You were trying to coordinate this with your squadron?

A. Yes, Ma'am.

Q. Did you have trouble making that decision?

A. A lot of trouble, Ma'am. It was the hardest decision I've ever made.

Q. In fact, Sergeant Kelly sort of ended up telling you what to do about that, didn't he?

A. Basically, Ma'am.

Q. Did you understand that that was coordinated with your commander?

A. Yes, Ma'am.

Q. Did you ask Sergeant Kelly about that—whether it was or not?

A. I asked Sergeant Kelly what Colonel Favela would think of that and he said it would be fine, that he would back me up on that decision and to go ahead and deploy.

At best, it seems that the message to Wagner was, again, somewhat non-specific. This is not to say that Wagner did not perceive that he was supposed to continue getting treatment. Yet, the government's assertion that Wagner "breached" the agreement, after many months of faithful compliance, must be judged in the context of the situation he faced. It appears that Wagner was on his own, responsible for receiving treatment but unassisted in the acquisition of, and determination of, "adequate" treatment. When the commander approved his removal from the PAC program, there was at best an understanding that, upon returning from his TDY, he was supposed to "find some other type of counseling as long as he was getting treatment." There was no apparent definition of what "some other type of counseling" consisted of; no coordination with base or local agencies to identify alternative treatment; no effort to define participation in a specific treatment program as a condition of the agreement; and no requirement for Wagner to notify his commander of future arrangements and clear them for adequacy.

Admittedly, when Wagner returned from the TDY to Iceland, he did not enroll in a formal child sexual abuse treatment program comparable to the PAC program. The nearest formal program of that kind was located in a neighboring city which Wagner testified was too distant for his unreliable vehicle. Instead, he insured that he continued regular counseling sessions with Mrs. Pate and later, at her suggestion, added group therapy sessions. While these counselings were not specific for child abuse, Mrs. Pate testified that "it was part of our therapy." A fair reading of the record suggests that Wagner knew that these counselings were not a substitute for

---

9. Up until that time, Wagner had regularly attended the PAC program. All indications are that he was actively pursuing treatment and did not drop out of the PAC program lightly. In his testimony on the motion to dismiss, Wagner noted how difficult the decision had been. He stated he didn't want to disappoint Colonel Favela, and "I knew I had to stay in treatment and I wanted to get better." In his statement to OSI, referring to the TDY to Iceland, he explained: "This trip, the first deployment since this whole problem came to light, interfered with my therapy at PAC and they were unable to accomodate [sic] my special needs. After discussing this with Mrs. Pate of Mental Health, MSgt Kelley [sic], my First Sergeant, I decided that the Air Force needs come first above any and all personal goals, even at the risk of losing a source of help."

child abuse treatment; however, as his trial defense counsel argued, "[h]e had remained in treatment as best he could." Furthermore, when asked if he ever checked to see what kind of treatment Wagner was in after his TDY, Kelly testified: "Well, I talked with Mrs. Pate a couple of times simply to make sure that he was attending sessions at Mental Health which he was." Thus, Wagner's post-TDY treatment efforts were known to the squadron for some time and were apparently acceptable.

Under these circumstances, we find it patently unfair for the government to base its claim on "breach." It is not as if Wagner wholeheartedly reneged on the agreement. On the contrary, he acted in reasonable good faith for 15 months to fulfill his bargain with the Air Force, impressing all who treated him with his degree of self-insight and the sincerity of his quest for help. If the treatment he deemed available under the changed conditions facing him was inadequate, it would have been a simple matter for his commander to determine such and direct him toward adequate compliance. Failure or refusal to perform at that point may well have justified a claim that he had "breached" the agreement. Under the circumstances as they existed, however, we reject the assertion of "breach" as a basis to justify not enforcing Wagner's *de facto* immunity.

### III. Conclusion

Needless to say, Sergeant Wagner's offenses are serious ones. The sexual abuse of children is especially deplorable in both its marked departure from society's norms and its predictably devastating long-term impact on its thoroughly innocent victims. Issues surrounding the proper response to such offenses (prosecution versus treatment) abound and defy easy resolution. It should be clear, however, that when the handling of a particular case gives rise to a legitimate claim of *de facto* immunity, we will enforce it.

Accordingly, we find that Sergeant Wagner's good faith reliance on the promise of the government precludes his prosecution for these offenses. The findings of guilty

are set aside, and the charges and specifications are dismissed.

Chief Judge DIXON and Judge McLAUTHLIN concur.