**UNITED STATES**

v.

**Kevin W. REYES, 458 67 4947 Radioman Seaman Recruit (E-1), U.S. Navy.**

**NMCM 92 0255.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 6 Dec. 1991.

Decided 29 March 1993.

Lt David P. Sheldon, JAGC, USNR, Appellate Defense Counsel.

Lcdr Stephen A. Stallings, JAGC, USN, Appellate Government Counsel.

Before FREYER, Senior Judge, and WELCH, MOLLISON, JJ.

PER CURIAM:

While being minded by the appellant, his girlfriend's infant son incurred what were eventually discovered to be life-threatening internal injuries. The appellant had told the mother that whatever injuries the victim may have incurred must have been caused by his two-year-old sister's falling onto him and poking him with a fork. For several days, the appellant, perhaps unaware of the severity of the injuries, tried to convince the mother not to take the victim to the U.S. Naval Hospital, because he was concerned about questions that might be asked regarding the origin of the injuries. Notwithstanding his pleas, the appellant was found guilty by officer members of assault with intentional infliction of grievous bodily harm. We have no hesitancy whatever in affirming the findings of guilty of that heinous offense.

The appellant was also found guilty of obstructing justice by misinforming the mother of the cause of the injuries and influencing, or attempting to influence, her from seeking medical attention and/or treatment for the victim. In two assignments of error,[1] the appellant challenges

---

1.   I. THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE APPELLANT GUILTY OF OBSTRUCTION OF JUSTICE WHERE THE GOVERNMENT FAILED TO PROVE THAT ANY LAW ENFORCEMENT AGENCY WAS CONDUCTING AN INVESTIGATION.

II. IN THE ALTERNATIVE, IF CHARGE III IS FOUND TO BE AN OFFENSE UNDER THE U.C.M.J., THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT OBSTRUCTED JUSTICE.

III. ADMISSION OF APPELLANT'S STATEMENT WHICH OCCURRED THREE MONTHS PRIOR TO THE ALLEGED CRIME WHERE AP-

PELLANT STATED THAT 'IF THE KID WAKES UP AT NIGHT, HE [APPELLANT] WOULD DROP KICK THE KID' CAUSED PLAIN ERROR WHEN THE TRIAL COUNSEL ARGUED ON THE FINDINGS, BEFORE A MEMBERS PANEL, THAT THIS PROVED THAT APPELLANT HAD ACTED IN CONFORMITY WITH HIS STATEMENT.

IV. APPELLANT'S COURT–MARTIAL VIOLATED HIS RIGHT TO DUE PROCESS UNDER THE FIFTH AMENDMENT BECAUSE ARTICLE 52(a)(2), U.C.M.J., ALLOWED A SIX MEMBER GENERAL COURT–MARTIAL PANEL TO CONVICT APPELLANT WITH THE POSSIBLE

this finding of guilty. We think that these assignments of error have merit.

What the appellant sought proximately to deter was a medical examination of the victim, which, presumably, would have raised suspicions regarding the origin of the injuries. Presumably also, the medical authorities would have referred the matter to the Family Advocacy Committee, which, upon further inquiries, might have called in the Naval Investigative Service. Thus, while a future criminal investigation was not unforeseeable, at the time of the alleged obstruction the authorities had not discovered any crime, and no criminal investigation was then contemplated by them.

We find this case indistinguishable from *United States v. Turner*, 33 M.J. 40 (C.M.A.1991). There the accused was required to participate in a command-directed unit urinalysis inspection; fearing that her recent drug use would be detected, she substituted toilet bowl water for her urine. When that was recognized for what it was, she was instructed to provide a genuine sample of her urine, which tested positive for cocaine use. Her conviction for obstruction of justice was reversed by the U.S. Court of Military Appeals on the following reasoning: ·

> Here the alleged obstructionist act consisted of appellant's attempting to preclude discovery of her offense by impeding an inspection, not a criminal investigation. At the time of the inspection, she was not a suspect in any crime or part of any criminal investigation. There were no other criminal proceedings or

other official acts taking place that would lead to disciplinary action.

33 M.J. at 42–43.

That is precisely the situation in this case. The appellant sought to preclude discovery of his offense by impeding a medical examination, not a criminal investigation. Even when grounds to suspect criminal activity appear in the course of a medical examination, the medical examination is not thereby converted into a criminal investigation, *United States v. Fisher*, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972), and even questioning regarding possible criminal abuse during a medical examination has been viewed as relating to diagnosis and treatment, vice criminal investigation, *United States v. Edens*, 31 M.J. 267 (C.M.A.1990). At the time the child would have been presented for examination in this case, the appellant would not have been a suspect in any crime nor part of any criminal investigation. There would have been at that time no criminal proceedings or other official acts taking place that would lead to disciplinary action. Of course, the results of the medical examination might eventually have led, via a Family Advocacy inquiry, to a criminal investigation, but the same was obviously true for Turner's urinalysis inspection.[2] It was not only foreseeable to Turner, but virtually inevitable, that the "positive" urinalysis which Turner knew would be forthcoming would lead to criminal prosecution or disciplinary action of some sort, and the urinalysis inspection in *Turner* did, in fact, lead to criminal prosecution, yet there was no obstruction of justice. So it must be here.[3]

CONCURRENCE OF ONLY FOUR OF THE VOTING MEMBERS.

2. If anything, this case is even weaker than *Turner*, because Turner's connection with her own urine sample would have been clearly documented and, thus, apparent during the urinalysis without any investigation, whereas the appellant's connection with the child and his injuries would not have been apparent from the mother's presentation of the child for examination, nor from the medical examination itself, but only from investigation after suspicious causation had been medically determined.

3. The dissent's purported distinction between *Turner* and this case depends on limiting the

"inspection" in *Turner* to the mere "presentation" of the urine without regard to its subsequent scientific analysis. As we know, however, an "inspection" of urine encompasses both collection and scientific analysis (hence the term "urinalysis"); consequently, Turner's actions in obstructing the "inspection" must be viewed as impeding not only the mere collection of her urine but also its scientific analysis. At some point during the scientific analysis phase of the "inspection" 'of Turner's urine, her use of cocaine would have become manifest, just as child abuse would presumably have been revealed by the medical examination in this case. In any event, what the appellant sought proximately to prevent was the child's presentation for exami-

Whether or not Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, encompasses offenses analogous to those defined by various state statutes prohibiting child neglect and reckless endangerment, under which this appellant might have been successfully prosecuted, is a matter which may warrant consideration in future cases.

The findings of guilty of Charge III and its Specification are set aside, and that charge and specification are dismissed. The remaining findings of guilty are affirmed. The sentence has been reassessed on the basis of the affirmed findings of guilty in accordance with *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), and is affirmed.

WELCH, Judge (dissenting):

I dissent from the majority's decision to dismiss the obstruction of justice charge, but not their decision to affirm the sentence adjudged. My dissent is based on three major considerations: the nature of the victim's injuries, the knowledge attributable to the appellant concerning the consequences of taking the victim to the hospital, and my belief that *United States v. Turner*, 33 M.J. 40 (C.M.A.1992) is not dispositive (i.e., that a charge of obstruction of justice is legally and factually supported by the evidence in this case). My reasoning is explained in the following comments.

## I. *The Victim's Injuries*

The record is replete with evidence of the 14 month old victim's life-threatening injuries. To borrow a descriptive comment from the Article 32 investigative report at page 8, attributed by Dr. Whitfield to the staff nurse, although the injuries were reportedly caused by a fork wielded by a two year old sibling, they looked "more consistent with a baseball bat." More specifically, when asked what would happen if a child with injuries such as the victim's was brought to an emergency room, Dr. Whitfield's stated that child abuse would be immediately suspected—as it was in this case. Record at 132.

nation. Consequently, we are satisfied that the

## II. *Knowledge Attributable to the Appellant*

Two things are clear from this record. First, the appellant knew how the victim had been injured and the amount of force that was used. This conclusion follows from the findings of the court members and our affirmance of the appellant's conviction of assault intentionally inflicting grievous bodily harm. Second, the appellant knew that taking the victim to the hospital would result in his conduct being the subject of inquiry of a criminal nature. This conclusion is supported by evidence in the record establishing that the appellant and the victim's mother discussed their fears that taking the baby to the hospital would result in "Family Advocacy" thinking that one of them had abused the child. Record at 88 and 191. Additionally, the appellant told two of his superiors that he did not take the victim to the hospital because he did not want to answer any questions. Record at 151 and 156. Furthermore, at the time of the victim's injuries, the appellant was a 20 year old sailor with the intelligence to qualify as a radioman. He had also been the recipient of nonjudicial punishment on three occasions, been convicted in a Japanese court on one occasion, and been appropriately counselled on several occasions by his superiors concerning the adverse effects of future unacceptable conduct. Stated otherwise, the appellant understood the consequences of committing violations of the law.

This evidence convinces me beyond reasonable doubt that the appellant must have known that he had committed child abuse by injuring the victim, that the nature of the child's injury would be readily apparent to medical personnel at the hospital, that the injuries to the child were not of a minor nature, that he would be the number one suspect in a child abuse investigation soon after the child arrived at the hospital, and that such an investigation could lead to disciplinary action being taken against him.

## III. *The Applicable Law*

In my opinion, the legal issue raised is whether a service member who is a child

analogy between *Turner* and this case holds.

abuser may commit the offense of obstruction of justice by taking action intended to prevent the child victim from being examined at a service medical facility. I conclude, as did the court members, that obstruction of justice may be committed under these circumstances.

The most recent statement by the Court of Military Appeals concerning obstruction of justice before initiation of criminal proceedings is *United States v. Athey*, 34 M.J. 44 (C.M.A.1992). *See also United States v. Gussen*, 33 M.J. 736 (A.C.M.R.1991) for a good discussion of applicable law.

*Athey* mentions three relevant principles of law concerning obstruction of justice before initiation or criminal proceedings. First, to commit the offense, the accused must have "had reason to believe there were or *would be* criminal proceedings pending" against himself or some other person. *Id.* at 48. Second, the accused's act must have been done "with the intent to influence, impede, or otherwise obstruct the due administration of justice ... a subjective requirement." *Id.* at 49. Third, the words "due administration of justice" contemplate justice as administered in criminal proceedings. Thus, commission of the offense requires an intent to obstruct a potential criminal proceeding. *Id.* at 49.

Based on *Athey*, it is clear that an accused cannot be convicted of the offense if he never foresees that a criminal proceeding may take place, but may if he surmises that there is a possibility that, at some time, a criminal proceeding might take place, a proceeding which he wishes to prevent. *Athey* also stands for the general rule that *merely* asking a person not to report a crime is not obstruction of justice.

In my opinion, the appellant's case falls within the above-described legitimate perimeters of prosecution for obstruction of justice occurring before the commencement of formal disciplinary action. Like the court members who tried the case following the instructions of the judge, I conclude that the appellant had reason to believe that his assault on the victim would be discovered if the child was taken to the hospital and that the discovery would lead to criminal proceedings against him.

I differ from the majority concerning the legal effect of the inevitable medical examination at the hospital envisioned by the appellant. In my opinion, *United States v. Turner*, 33 M.J. 40 (C.M.A.1991), relied on by the majority, is distinguishable from this case. Verbiage in *Turner* noting that there was no criminal proceeding taking place at the time of the urinalysis testing is irrelevant because *Athey*, subsequently decided, reaffirms the principle that obstruction of justice can occur before the beginning of criminal proceedings. More importantly, I cannot equate the inspection in *Turner* to the hospital examination of the child victim in this case. *Turner* emphasized that at the urinalysis inspection no one individual was singled out, that the accused was selected randomly to provide urine, and that the accused was not then a suspect in a criminal investigation. Such is not the case when an abused child is presented for examination at a service medical facility. In contrast to *Turner*, the examination of an abused child by medical personnel at a service hospital *does* single out individuals for careful attention. It is *not* a random event—it involves a live child literally crying out for immediate attention and an immediate effort to determine who abused the child, which is a precursor to required referral to law enforcement authorities for additional investigative action. Most significantly, the alleged abuser is considered a suspect based on immediately available evidence indicative of a violation of the Uniform Code of Military Justice.

All services have had Family Advocacy Programs (FAP) for years. One important objective of such programs to assure that child abuse will be readily detected and reported to military law enforcement authorities. *See* SECNAVINST 1752.3; OPNAVINST 1752.2; BUMEDINST 6320.57; *United States v. McClelland*, 26 M.J. 504 (A.C.M.R.1988); and *United States v. Spence*, 29 M.J. 630 (A.F.C.M.R.1989).

*McClelland* indicates how FAP's work and how suspected child abusers must be treated. Mrs. McClelland, wife of the ac-

cused, told Major Niemeyer, the Director of the Social Services Department at an Army hospital, about her husband's sexual maltreatment of her daughter. Major Niemeyer knew of the requirement in Army Regulations to report allegations of child abuse to military authorities. The question presented on review was whether Major Niemeyer was required to give the accused Article 31, Uniform Code of Military Justice, warnings before questioning him. The Court held that he was, noting (a) that any reasonable person given the same information would have concluded that the accused was suspected of having committed a criminal offense, and (b) that Major Niemeyer was acting in an official capacity as investigator for the child advocacy council seeking a criminal admission or confession.

Based on the attention focused on child abuse and the FAP during the last decade, I submit that anyone of average intelligence in the U.S. Armed Forces knows that child abuse may lead to criminal proceedings when that abuse is detected at a military hospital. This case illustrates that point: the appellant and the victim's mother talked about the possibility of child abuse being alleged if they brought the child to the hospital. Based on the nature of the injury to the victim, the conversations about the FAP, and the appellant's prior exposure to the criminal justice system, I am confident that he knew that his actions would lead to a criminal investigation focused on him.

Returning to *Turner*, I believe the resolution of the case was based on the unique character of the military inspection known as urinalysis testing. By presenting toilet water, not her urine, the accused attempted to impede an inspection, a unique military event that serves a myriad of purposes. As a practical matter, the urinalysis testing process could not be characterized as a step in the criminal prosecution process because it is regarded as non-prosecutorial in nature. Additionally, there are subtle differences between presenting urine for analysis and presenting a badly injured child for examination. For one thing, when urine is presented, nobody starts immediately asking questions and recording responses that

can later be used in evidence in criminal proceedings, as they do when an injured child is presented.

At the bottom line, the majority's position must be that a child abuser can not attempt to obstruct justice by preventing the child from being examined at a military hospital because such activity is not an effort to impede a criminal investigation. I disagree, choosing to believe that such action is most appropriately characterized as an effort to obstruct justice.

In summary, I believe this case should be resolved on the basis of the principles stated in *Athey* and cases cited therein, not on *Turner* and the unique factual situation presented therein, that efforts to prevent the reporting of abuse to children may be found to be an obstruction of justice (which is just what the appellant intended in this case), and that we should give significant deference to the determinations made by the triers of fact who were properly instructed on the elements of the offense.